COMMONWEALTH of Pennsylvania ex rel. George W. CRAIG

v.

James F. MARONEY, Superintendent, State Correctional Institution, Pittsburgh, Pennsylvania.

Civ. A. No. 62-691.

United States District Court
W. D. Pennsylvania.

May 28, 1964.

Martin Sheinman, Pittsburgh, Pa., for relator.

ROSENBERG, District Judge.

The relator is confined in the State Correctional Institution at Pittsburgh, Pennsylvania under a life sentence for the murder of one Clarence Nellis. He now petitions this Court for a Writ of Habeas Corpus.

The relator presents thirty-five numbered objections against his prosecution proceedings by which he was convicted of the crime of murder. With the exception of two, his numerous objections refer to trial matters not presenting constitutional questions. As to such questions here raised as may present federal questions, I have examined the record and heard essential witnesses.

Upon presentation of the petition, I granted a rule upon the District Attorney of Butler County, Pennsylvania and others to show cause why a writ of habeas corpus should not be granted. I thereupon appointed Alvin D. Capozzi, Esq., to represent the relator. He reported to me personally on several occasions and informed me that he had conferred with the relator and had studied the record. He eventually informed me that he could not fairly represent the relator and he was permitted to withdraw his appearance. I thereafter appointed Byrd R. Brown, Esq., as his attorney. Mr. Brown's relationship as counsel in this case paralleled that of Mr. Capozzi, and he eventually requested leave to withdraw because of other business pressure. I granted such leave. I then appointed Martin Sheinman, Esq., as his attorney and he represented and continues to represent the relator. I scheduled a day for hearing and brought the relator into court and procured the attendance of such other witnesses as desired by the relator and his counsel.

The District Attorney of Butler County is now newly elected and I awaited his brief. I now have that brief before me and have given it careful consideration, together with the brief as presented by counsel for the relator.

The following information is taken from the trial transcript of the Butler County Court. On December 26, 1959, John C. E. Nellis met death when the top of his head was blown off by a shotgun blast at close range. The body

was discovered by a constable on the morning of December 27th. On the afternoon of December 27th, Sergeant James D. Barger of the Pennsylvania State Police removed a double barrelled shotgun from the home of George W. Craig. This shotgun was later proven to be the murder weapon. On that afternoon Craig, in a highly intoxicated condition, was then taken into custody by the Pennsylvania State Police. On December 29th, he was charged with murder before an alderman of Butler County. At that time he was advised of his right to counsel and a hearing was continued until January 28, 1960 when he was represented by counsel. After Craig was arrested and before he was formally charged with the crime on December 29th, he was questioned on December 27th by Detective Sergeant Barger for forty-five minutes and by District Attorney Doerr for one hour. On December 28th, he was questioned again for short periods of time. During all of this time, he was uncooperative and his attitude remained belligerent. During these conversations, the record indicates that he did most of the talking. So that during this forty six hour period the relator made no confession to the investigating officers. Attorney Arman R. Cingolani first talked to the relator on December 30, 1959, although he had been contacted in regards to the case some time earlier and advised the relator "not to make any statements to anybody under any circumstances". Mr. Cingolani attended the preliminary hearing in the case and was thereafter appointed by the court to represent the relator with Attorney Michael M. Mamula. Both Mr. Cingolani and Mr. Mamula were members of the Butler County Bar. On the night of December 31st the relator broke his eye glasses and cut a wrist. He was immediately taken to the Butler County Memorial Hospital where he was treated and returned to the Butler County Correctional Institution. At about 9:00 o'clock on the morning of January 1st, he was visited in his cell by the then District Attorney

Doerr and Sergeant Barger, but made no statement of any kind at that time. About 4:00 o'clock of that afternoon District Attorney Doerr and Sergeant Barger were summoned by the relator. He thereupon informed them that "he wanted to make a clean breast of the whole thing". (Tr. pg. 170) He indicated that he would be willing to give a signed statement. At that time he was reminded that he had an attorney and he replied, "I don't need an attorney. I know what is best". (Tr. pg. 185). The relator then proceeded to dictate to Sergeant Barger the details as are set forth in the typed confession which consisted of seven pages. The relator at that time appeared to be normal and physically fit. He was not under the influence of intoxicating liquor or drugs. At that time the District Attorney reminded him, (Tr. pg. 199), "do you know that you have certain constitutional rights and are not compelled to say anything?", and the relator answered "Yes".

As to the two objections to consider, the first is that as contained in objection No. 19 raising a question under the Fifth Amendment of the United States Constitution of double jeopardy, and the second is that contained in objection No. 23 as it relates to the obtaining of a confession contrary to the provisions of the United States Constitution.

In support of the relator's contention that his confession was unconstitutionally elicited by the Commonwealth, the relator testified before me that he was arrested on December 27, 1959 in Butler County at a state police roadblock without a warrant, and that he was searched and incarcerated in the Butler State Police Barracks without being informed of the reason for his arrest; that he was very intoxicated at the time of his arrest; that he was interrogated for a period of forty-six to forty-eight hours without sleep; that he was later abused by the then Detective Sergeant James Barger of the Pennsylvania State Police who conducted the interrogation; that

he was not able nor permitted to contact or secure an attorney during the forty-six to forty-eight hours; that while he was accused of being a "murdering so and so" as to the death of Nellis, he was not formally charged for murder until after forty-eight hours of interrogation; that at his arraignment before a squire or alderman at a preliminary hearing, he was not permitted an attorney and advised to plead not guilty by the squire; that during his stay in the Butler County Penal Institution, he had been taking a cactus narcotic called peyote which he had concealed in his socks; that he later consumed phenobarbital which admittedly had been available to prisoners as dispensed by prison guards; that while he could not specifically relate how often or the length of the effect of such drugs, he definitely remained under the influence of such drugs through January 1, 1960, when he attempted suicide and through January 2, 1960 when he issued his confession; that, because of depression and concern for his family he attempted suicide on January 1, 1960 by breaking his glasses and slashing his wrist; that his suicide attempt was discovered and he was taken to the prison hospital and treated; that he remained there four hours and was then returned to his cell; that at 9:00 o'clock the next morning on January 2, 1960, the District Attorney, Donald Doerr, appeared and it was at this time that he made his confession before the District Attorney and Sergeant Barger; that despite the length of his confession the information contained therein was not read to him nor was he informed of his rights prior to his statement; and that he made his confession not because he murdered Nellis, but because of his concern for his family and his concern for one Duffy, an alleged accessory to the crime, who had been committed with Craig, and also because he wanted relief from the interrogation of the police officers.

In rebuttal of these accusations, the Commonwealth then placed Sergeant Barger on the stand who testified that he was a State Trooper for twenty-two years; that he signed the information; that the relator was intoxicated and belligerent during his arrest and commitment; that upon arrest the relator was searched completely, including his socks and shoes and that the search revealed no pills or drugs in his possession; that the relator affirmatively asserted he did not need any attorney; that there was little interrogation due to the relator's belligerency; that the relator was arrested as a suspect in this case because of a motive for revenge based on past criminal cases in Butler County; that no interrogation was taken of the relator without the Sergeant's presence; that the relator's confession was given fully, freely and of his own initiative; that the confession was the account of the relator and substantially the narration in his own words; and that while the confession was given the relator was noticeably clear-minded and understanding and wanted to make a clean breast of the whole thing.

On cross-examination, Sergeant Barger admitted that at one time he told the relator that his wife could be subpoenaed knowing that a wife cannot be compelled to testify against her husband; that if the defendant stood trial, his wife and children would be brought in as witnesses (he denied stating that they would have to "drag" his wife in); that he said, "If I knew of the suicide, I would have brought a rope"; that he knew the relator had counsel; that he knew the defense attorney either said or would have said the relator should not answer any questions; that he showed papers to the relator indicating them to be statements taken of his wife and children; that he sent two officers to pick up the children (teenage daughters) without warrants for statements at the police barracks; that Duffy was arrested solely because he lived nearby the scene and there was reason to believe he had knowledge of the events; that he testified he received a call from the Warden to come to the prison; that

upon arrival at the prison, the relator was very friendly, cooperative and alert; that the statement as typed was a verbatim statement of relator's own words which took about two hours to transcribe; that it was sworn to at Alderman Armstrong's office; that the statements were read to him; and that the relator had an extra pair of glasses on his person.

The District Attorney, Donald Doerr, also testified, describing the confession and stating that the relator was or appeared perfectly normal; that the relator asked him the consequences of a confession and the relator stated that he did commit the murder; and that he did not mention his wife and children, nor his fear of their arrest. On cross-examination, the District Attorney admitted that he did not ask the relator whether he wanted a lawyer.

Was the relator coerced into making a confession? The relator stated that he was interrogated without sleep from forty-six to forty-eight hours. Despite the relator's contention, it does not appear from the credible evidence that the relator was subjected to exhaustive and extensive questioning. Although the relator has made damaging accusations, after hearing the testimony and observing the demeanor and believability or credibility of all the witnesses placed on the stand, I cannot accept as matters of fact the version advanced by the relator. I am convinced that the relator was not subjected to extensive interrogation or such abuse as overawed him mentally or psychologically and so as to cause him to make a confession of such detail and length as he did. The relator's contention that he was under sedation and in a weakened condition because of his cutting a wrist is not borne out by the evidence. At the hospital he was retained for four hours and received, at the most, minor first aid. He had been returned from the hospital early in the morning. At 9:00 o'clock, when visited by the District Attorney and Sergeant Barger, no communication resulted. But at 4:00 o'clock of that afternoon when the relator called these two and indicated his desire to make a clean breast of the whole thing, the evidence was that he was not physically incapacitated nor in any weakened condition, and that he was mentally alert so as to volubly gush out a most detailed confession of what had occurred with him from A to Z.

I am convinced that his attempt or the slashing or cutting of his wrist was not a sincere desire to take his own life, but rather a superficial action intended for show or exhibition and very likely for the purpose of procuring sympathy.

The relator claims that he was in a state of apprehension that the police were going to drag his wife and family into this matter, but the record does not bear out this contention. At the time of the taking of his confession, the relator showed not the slightest apprehension in regards to his wife or children, nor did he procure any promise from his jailors that his wife and children would be untouched, nor did he indicate any concern about anything. Outside of his own assertion, there was no circumstance which indicated the relator was intoxicated, not alert, or in a dazed or doped condition when he narrated what had happened. On the contrary, the evidence is convincing that his mind was clear and his mental ability such as enabled him to recollect and to relate all his goings and comings with detailed precision.

As for the relator's contention now that his confession was taken without the presence of his lawyer, there is evidence that Mr. Cingolani, one of his lawyers, hold him not to talk. But it is clear that the relator was a man of sufficient intelligence and understanding of his situation to know whether he wanted or needed the advice of his counsel at the time and under the circumstances. What he did here in asking for the District Attorney and the police officer to come to him appears to be indicative of the fact that he desired to talk without the permission of his lawyer who had already warned him not to talk. In fact, as previously stated, he even said so.

 It is not the intention of the law, nor the desire of the administrators of justice, to prevent defendants from speaking freely and honestly when they desire so to do. It is the design of the law only to protect defendants against improper abuse by overly ambitious law enforcement officers. United States ex rel. Johnson v. Yeager (Cassidy v. Yeager), 327 F.2d 311, 317. The fact that a defendant makes a voluntary statement outside of the permission of his counsel does not in itself vitiate such a statement. Crooker v. California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958).

From hearing the evidence in this case and from an examination of the confession itself, I am convinced that the relator spoke volubly, freely and detailedly. There is neither credible evidence that the confession was produced because of pressure by anyone or because of apprehension on the part of the relator. Neither is there any credible evidence that he suffered any physical deprivation because of the cutting of his wrist which, as the evidence indicates, was a superficial laceration from which the relator suffered not at all after his return to the jail from the hospital.

There is no credible evidence here that there was coercion or intimidation of any kind by the District Attorney or the State police officer or anyone else. The evidence is plain that he could have had his attorney with him had he so desired, and that there was no deprivation of counsel during the time when the confession was made. Just as he had the right to summon the District Attorney and the State police officer, so, too, he had the right to summon his attorney. That he did not summon his attorney makes it clear that he did not wish to follow his attorney's advice.

 I, therefore, conclude that the confession of the relator was voluntarily offered without any undue influence or coercion during the time when the rela-

tor possessed his full faculties and senses. Under these circumstances, the admission into evidence of his confession was not a violation of any of the provisions of the United States Constitution or its amendments.

The other objection which raises a federal question here is: Did the Commonwealth of Pennsylvania violate the double jeopardy clause of the Fifth Amendment of the United States Constitution?

After being indicted for murder, the relator was tried in the early part of June 1960. The trial lasted eight days and the jury returned a verdict of guilty of murder in the first degree and recommended life imprisonment as a penalty. During the course of the trial on the morning of the fourth day of June at about 9:30 o'clock, the court was informed that the relator, as the then defendant, was not physically or mentally able to proceed because he was acting strangely and his speech, gait and coordination were impaired. Thereupon the trial judge interrupted the trial and summoned a physician who reported that the relator was under the influence of sedatives. The judge also launched an inquiry into the available source of sedatives in the County Jail.

He gives an account of what had happened in an opinion which was filed in another habeas corpus case involving one John Hawryliak. The facts in the Hawryliak case are not parallel to those in the instant case, except for the fact that it had eventually become a matter of knowledge that aspirin and phenobarbital tablets had been distributed in the Butler County jail to prisoners without a doctor's prescription, and that some prisoners accumulated these. This vicious practice was discovered during the first trial of Craig, and Judge Shumaker quickly eliminated this practice.

Judge Shumaker in the Hawryliak petition for a writ of habeas corpus made these frank statements:[1]

1. Court of Common Pleas of Butler County, Pennsylvania, No. 40 September Term 1961.

"Other testimony taken at this hearing (Craig) had to do with a practice at the jail severely condemned and criticized by this Court and now discontinued. When it was bedtime for the prisoners confined in the jail, the turnkey on duty passed out aspirin tablets and barbiturates, namely, phenobarbital to prisoners requesting the same. The latter, being in one-half grain tablets were sometimes not consumed but accumulated. Sometimes the pills were acquired by non-users and later given to other prisoners or used for barter or exchange. These were administered without doctor's prescription or order and without supervision or order and without supervision.

"This untenable situation first came to the attention of the Court during the murder trial of George W. Craig when that defendant appeared in Court in such a state of stupefaction that he was unable to take the witness stand and testify in his own behalf or assist his attorneys in handling his defense. His trial had to be interrupted and continued. Later this Court granted a new trial, assigning the use of the barbiturates as the reason therefore."

After conviction by the jury and recommendation of a life sentence, counsel for Craig filed a motion for a new trial. The motion was granted as a matter of course, and when the case was tried some time in September 1960, aspirin and phenobarbital were no longer dispensed by the jail wardens. At the second trial, the defendant was again found guilty of murder in the first degree and by separate verdict under the Split Verdict Act,[2] the jury after hearing further evidence fixed the penalty as life imprisonment.

█ The Supreme Court has long favored the rule of discretion that a trial judge may require a second trial on the same issues where his failure to do so would defeat the ends of justice. Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949). At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an imperious necessity to do so. Wade v. Hunter, supra, 336 U.S. 690, 69 S.Ct. 834.

█ The very fact that a second jury has been empaneled and sworn does not in itself constitute double jeopardy. Courts have authority to discharge a jury from giving any verdict, whenever in their sound discretion, taking all circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. Wade v. Hunter, supra. This is true also where there exist such circumstances or emergencies which by diligence could not have been averted and which would thwart the administration of justice. Himmelfarb v. United States, 9 Cir., 175 F.2d 924. So that where a jury trial is interrupted and the jury is excused and separated before it has rendered a verdict, under circumstances necessary for the protection of the defendant, even though without the defendant's action and express consent, there is no violation of the double jeopardy provisions of the Constitution. Gori v. United States, 1961, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901; Downum v. United States, C.A.5, 1962, 300 F.2d 137, cert. granted 371 U.S. 811, 83 S.Ct. 54, 9 L.Ed.2d 54; Killilea v. United States, 1 Cir., 287 F.2d 212, cert. den. 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed. 2d 1259, rehearing denied 368 U.S. 872, 82 S.Ct. 64, 7 L.Ed.2d 73.

█ But in this case, the jury did arrive at a verdict and the grant of a new trial by Judge Shumaker was well within the precautionary measure as dictated by the circumstances of the case—

2. Act of 1939, June 24, P.L. 872 § 701; 1959 December 1, P.L. 1621, § 1, 18 P.S. § 4701.

and especially after a motion was made by counsel for the defendant for a new trial. The trial judge's action was done with the view of procuring a fair trial for the defendant; and where a court concludes, upon information, that circumstances make it impossible for the jury to act with the independence and freedom on the part of each juror requisite to a fair trial of the issue between the parties, it is within the authority of the court to order the jury to be discharged and to put the defendant on trial by another jury. The defendant is not thereby put twice in jeopardy. Simmons v. United States, 1891, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968.

In any event, the defendant may not ask for a new trial where he has been once convicted and after the grant of a new trial lay claim that the grant of a new trial placed him twice in jeopardy. United States of America ex rel. Melton v. Hendrick, 1963, 218 F. Supp. 293. The fact that the trial judge may have agreed with the relator that a new trial was in order as a matter of justice will not avail the relator in laying claim to double jeopardy. Our Court of Appeals for the Third Circuit affirmed this holding in 330 F.2d 263, when at page 265 it said that it agreed "with the District Court's holding that under Pennsylvania law Melton 'waived his protection against being tried again for the same offense by his application for a new trial, since the court considers that the first jeopardy in which he was placed continues until the time of imposition of legal sentence at a subsequent trial.' "

The question may be here raised as to whether or not there has been an exhaustion of the state remedies by the relator prior to the filing of the petition here. The record indicates that the relator's counsel, Cingolani, had believed it futile to file an appeal to the Pennsylvania appellate courts. There is no question of Mr. Cingolani's ability and standing in the community. It was a legal question for determination between him and his client. Nevertheless, this does not prevent a determination being made here in accordance with Footnote 5 as presented in Melton, supra, to this effect:

"5. In Note 7, 218 F.Supp. at p. 296, the District Court expressed doubt as to whether Melton had exhausted his state remedies with respect to his contention that he had been subjected to cruel and unusual punishment in violation of federal constitutional rights. On that score we need only say that in In re Ernst's Petition [3 Cir.], 294 F.2d 556, pp. 561, 562 (1961), cert. den. 368 U.S. 917, 82 S.Ct. 198, 7 L.Ed. 2d 132 we expressly held that: 'Denial of a state prisoner's petition for habeas corpus on its merits remains permissible under Section 2241 even though state remedies may not have been exhausted.' "

Since the relator's petition, record and evidence as submitted here do not show any violation of our constitutional provisions, the petition for the issuance of a Writ of Habeas Corpus will be denied.