Manuel Piñero Agosto, peticionario, *v.* Tribunal Superior de San Juan, Hon. Gerardo Carreira Más, Juez, demandado; El Pueblo de Puerto Rico, interventor.

Número: C-65-34      Resuelto: 20 de marzo de 1967

*Ángel Viera Martínez,* abogado del peticionario; *J. B. Fernández Badillo, Procurador General, Peter Ortiz* y *E. Arcaya, Procuradores Generales Auxiliares,* abogados del interventor.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El peticionario Manuel Piñero Agosto fue enjuiciado en la Sala de San Juan del Tribunal Superior por los delitos de asesinato en primer grado por la muerte de un policía, e infracción al Art. 8 de la Ley de Armas. El 17 de marzo de 1964 comenzó su proceso. El jurado prestó juramento final y se presentó la prueba de ambas partes. En la audiencia del 9 de abril de 1964 el Ministerio Público, después de presentar un testigo de refutación, hizo un planteamiento en Corte abierta y en ausencia del jurado sobre la conducta de dos de dichos jurados, los señores Reyes Aquino Rodríguez y Milton Rosado López. Pidió el fiscal que estos dos jurados fueran sustituidos.

El Tribunal decretó un receso y celebró sesión el próximo día 10 constituido en Cámara, con la presencia del acusado, sus abogados y del Ministerio Fiscal, para dilucidar el planteamiento hecho. En expresión del juez que presidía al constituirse en Cámara, uno de los planteamientos fue al efecto de que el jurado Sr. Reyes Aquino al ser preguntado para su cualificación y ante una pregunta formulada a él o colectivamente formulada al jurado en cuanto a que si él o algún familiar o alguna persona allegada a él se había visto envuelta en alguna ocasión en un delito de violencia, el jurado Reyes Aquino había contestado en la negativa, cuando el fiscal tenía prueba en contrario. Al hacer su imputación en corte abierta el fiscal aseguró el haberle preguntado al jurado Reyes Aquino si había tenido algún incidente con algún policía, o en el hogar, directamente, o alguno de sus familiares, y dijo que había sabido que el padre del jurado fue procesado por asesinato y absuelto y un hermano también procesado por asesinato y cumplió sentencia, y que el jurado Reyes Aquino le ocultó estos hechos y por tal motivo no lo recusó. Manifestó el Magistrado que después de leídas las notas taquigráficas del procedimiento de insaculación no aparecía del récord que a este jurado el fiscal le preguntara sobre tales extremos ni tampoco aparecía que desde ese mo-

mento en adelante se hubiera preguntado sobre tales extremos al resto de los jurados colectivamente. Que el jurado Aquino en momento alguno ocultó nada a las partes ni al Tribunal en cuanto a sus cualificaciones para servir y por tanto el Tribunal resolvía que dicho jurado podía y debía permanecer en el proceso hasta su terminación.

En cuanto al jurado Sr. Milton Rosado López, le imputó el fiscal que en la tarde del 8 de abril de 1964, y frente a un establecimiento en Santurce, había manifestado delante de otro jurado, que "en ese caso el único testigo que ha dicho la verdad es el primer testigo que sentó la defensa porque vive frente adonde ocurrieron los hechos, los demás no saben nada ni han dicho verdad"; que el jurado que estaba junto a él no contestó nada; que en ese momento se acercó un tercer jurado y Rosado López repitió lo mismo; que este tercer jurado le contestó "eso se resolverá oportunamente, no ahora", y que de allí salieron en dirección al Tribunal. Imputó también el fiscal al jurado Rosado López que a las 8:40 de la mañana del día 9 de abril se le vio entrar al salón de abogados postulantes del Tribunal y salió del mismo a las 8:45 acompañado del acusado, de un hermano de éste y otra persona y que al llegar al pasillo se despidieron y dijo "nos vemos" y salió en dirección a la Sala número 3. El fiscal ofreció traer prueba de esos hechos.

La defensa hizo constar que había conversado con el fiscal en relación a esos extremos; que en cuanto a la denuncia de que el jurado Milton Rosado López había comentado la prueba con otros jurados la defensa no tenía ninguna prueba que oponer porque desconocía el hecho totalmente; que el fiscal le había asegurado que tenía prueba que ofrecer en ese sentido y la defensa confiaba en lo que le había dicho el Sr. Fiscal de manera que siendo ello así, "y produciéndose esa prueba que nos anuncia el señor Fiscal", se allanaba a que se excusara al jurado Milton Rosado López. En cuanto al otro incidente la defensa negó en todo momento que el acusado hubiera

estado reunido con dicho jurado o que hubiera hablado con él, pero habiendo ya aceptado que fuera sustituido por razón de que hubiera comentado la prueba, era innecesario que la defensa ofreciera prueba en relación a su negativa. Además, que por el sólo hecho de mencionarse que este jurado se hubiera conectado con el acusado en esa forma, aunque no era cierta la información, y por una cuestión de delicadeza se allanaba también a que se sustituyera dicho jurado.

Aceptada la sustitución por las partes, el fiscal hizo un nuevo planteamiento a base de que los otros dos jurados con quienes habló Rosado López no habían cumplido la orden del Tribunal de informar cualquier intervención por persona fuera del proceso o dentro del proceso que comentara sobre el caso, ni entre ellos mismos, hasta el momento de deliberar. Preguntó el Magistrado si el fiscal sabía quiénes eran esos otros jurados y el fiscal contestó "el Agente podría pero tengo el problema de que no quiero divulgar el nombre del Agente". Expuso el fiscal además que había habido amplia discusión relacionada con la imputación que él hacía a esos jurados con repercusión pública y que el jurado había visto en los periódicos lo ocurrido en el Tribunal, y pidió su disolución. A esta solicitud se opuso siempre la defensa.

Terminada la vista en Cámara el Tribunal se reservó su fallo en cuanto a la petición de disolver el jurado. Se constituyó de nuevo en corte abierta y sustituyó al jurado Milton Rosado López con uno de los dos suplentes. Hecha la sustitución el Tribunal recesó hasta el próximo lunes.

En la audiencia del lunes 13 de abril de 1964 el Tribunal procedió a disolver el jurado con la oposición expresa de la defensa. Al hacerlo se pronunció así:

"El viernes pasado, 10 de abril del corriente año este Tribunal se constituyó en cámara para realizar una investigación sobre un planteamiento formulado por el Fiscal Félix Ortiz Juan, representante del Ministerio Público en estos casos a los efectos de que había habido determinadas actuaciones cometidas por

parte de dos miembros del Jurado actuando en este proceso. El resultado de dicha investigación arrojó que no había base en cuanto a la querella contra el Jurado señor Reyes Aquino, por lo cual, según ya se sabe, el Tribunal no ordenó la sustitución de este Jurado, y determinó que continuara interviniendo en el proceso.

"Habiéndose estipulado por las partes lo que declararía el testigo ofrecido por el Ministerio Público en cuanto al Jurado Milton Rosado, el Tribunal resolvió que en vista de que el Jurado Milton Rosado, en contravención a las instrucciones que reiteradas veces el Tribunal le ha formulado a los miembros del Jurado sobre su conducta y actitud en relación con el proceso, una de las cuales es no comentar la prueba ni formar juicio sobre la misma hasta que los casos sean sometidos definitivamente a su consideración en el momento de deliberar, el Tribunal estimó que habiendo este Jurado comentado cierto aspecto de la prueba desfilada y habiéndose expresado a los efectos de que a cuál prueba le debía creer y cuál no infiriendo que había formado juicio en cuanto a ese aspecto de la prueba, el Tribunal entendió que debía ser sustituído por uno de los Jurados suplentes y de conformidad con las Reglas que me rigen, la 127 de Procedimiento Criminal actualmente vigentes en Puerto Rico, ordené su sustitución y fue sustituído por el señor José Pérez luego del sorteo correspondiente.

"Terminada o terminándose dicha vista en cámara, el Tribunal constituído en mi oficina como dije anteriormente, el Fiscal Ortiz Juan formuló un planteamiento, que por lo delicado y por lo serio, el Tribunal resolvió meditar y resolverlo en el día de hoy habiendo mediado la circunstancia de que había un sábado y domingo que no se trabaja y el Tribunal entonces resolvió que le podía dar más adecuado pensamiento a dicho planteamiento, por la circunstancia adicional de que ese Jurado que fue sustituído el jueves 8 o 9 de abril comentó públicamente la prueba en el caso en la forma ya indicada por el Tribunal, lo hizo en presencia de otros dos jurados que están entendiendo en el proceso, cuyos nombres no viene al caso mencionar aquí, ni se ha mencionado, ni es necesario mencionar, pero que según informa el Fiscal no se condujeron correctamente desde el punto de vista de que uno de ellos no comentó nada cuando se le acercó el jurado que fue sustituído y que el otro lo que comentó fue:

"eso se resolverá luego", sin embargo, esos dos jurados también faltaron a las instrucciones del Tribunal de que cualquier desviación por parte de cualquier persona hacia ellos o ante cualquiera de sus compañeros debía ser traída inmediatamente ante la consideración del Tribunal para la acción pertinente por el Tribunal y ello no se hizo así.

"Hubo otra versión y fue que el acusado fue visto en determinada ocasión con el Jurado que fue sustituído. La Defensa ha negado esa versión, sin embargo, es un elemento más que vicia el clima que debe imperar en el proceso. Por último esta situación se planteó originalmente el jueves por la tarde por el Fiscal Ortiz Juan, luego de retirar al Jurado para esos efectos. Se inició la investigación y se despachó al Jurado hasta el día siguiente. Se recluyó nuevamente al Jurado para celebrar la sesión en cámara, se trajo nuevamente al salón para sustituirse al Jurado Milton Rosado. Se instruyó rutinariamente al Jurado, pero la realidad es que por el tiempo transcurrido desde el jueves hasta el día de hoy, pretender que el Jurado no se haya enterado de lo que ha ocurrido sería pecar tremendamente de ingenuos. Aquí se ha traído los ejemplares de la prensa que han dado amplio despliegue a esta situación, a la acción tomada por el Tribunal. Decir que el Jurado no ha tenido acceso ni que lo ha visto sería una cosa de Ripley. Como dijo un alto magistrado en un Tribunal Superior. Dijo: 'los jueces no vivimos en un vacío' y si los jueces no viven en un vacío, mucho menos vive el Jurado que como quiera, por más instrucciones que reciban no están atados a la cosa técnica de la Ley como estamos nosotros los jueces, abogados, fiscales y los que bregamos con esta cosa desde el punto de vista jurídico.

"Por tanto, que se una al expediente de estos casos, para ulteriores planteamientos que pueda haber en cuanto a la determinación que va a hacer el Tribunal en el día de hoy, la edición final del periódico El Imparcial del viernes, 10 de abril de 1964; la edición final del periódico El Imparcial del sábado 11 de abril de 1964; la edición final del periódico El Mundo del viernes 10 de abril de 1964; la edición final del periódico El Mundo del sábado, 11 de abril de 1964, que creo que ha habido una confusión en una de esas crónicas sobre los nombres de los jurados concernidos, pero la información de los periódicos está casi exacta por no decir exacta.

"El Tribunal entiende que el clima creado por toda esta situación con motivo de las alegaciones sobre las cuales ya se tomó acción en cuanto a un Jurado, entiende que no es el clima ideal que debe imperar en un proceso de esta naturaleza, el clima en medio del cual deben operar y actuar doce ciudadanos en un caso como éste que aunque se supone que todos sean iguales, pero que hay casos que tienen más trascendencia que otros por la naturaleza del delito, como en éste, que es un caso que se procesa a un individuo acusándolo de haberle privado de la vida a un Policía, un asesinato en primer grado que en caso de una convicción puede conllevar el resto de sus días de vida recluído en la Penitenciaría Estatal. También están los derechos del Ministerio Público que viene aquí a representar el Estado, donde se le imputa a este acusado haber privado de la vida a un Policía, un agente de la Policía. En un caso como éste, el Tribunal entiende que existe una situación de emergencia, que no es el clima que debe imperar para que un Jurado pueda serenamente, objetivamente, imparcialmente sustraerse al impacto que ese clima pueda tener en sus conciencias y entendimiento para resolver adecuadamente un caso donde todo esto ha afectado su estado de ánimo. El Tribunal entiende que tiene que haberle afectado y va a proceder a disolver el Jurado, de conformidad con la facultad que me conceden las Reglas de Enjuiciamiento Criminal, la Núm. 144, que reza así: 'El Tribunal podrá ordenar . . . (el inciso que nos ocupa es el (d), que reza así: "Si se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que, a juicio del Tribunal, le impidiere al jurado rendir un veredicto justo e imparcial." '

"Quiero aclarar que el hecho de que se esté disolviendo este Jurado no significa necesariamente que ello pueda reflejarse sobre la conducta en sí del resto del Jurado que está entendiendo en el caso, pero el Tribunal repite que todo esto puede afectar su conciencia, su espíritu en tal forma que les impida aquilatar el resto de lo que falta del proceso para hacer una determinación tan importante en un caso como éste de esta naturaleza sobre la inocencia o culpabilidad de este acusado.

"También deseo hacer constar, que, aunque ojalá esto no hubiera ocurrido, además por los gastos que esto ha conllevado tanto para el Estado como para la Defensa, que hemos estado casi cuatro semanas entendiendo en este proceso, quizás a la

larga, por el impacto que ha tenido colectivamente, ahí está la prensa, ahí están los comentarios, esto yo creo que va a ser de muy buen provecho para la administración de la justicia en Puerto Rico, porque será un recordatorio un poco sensacional, quizás, de lo sagrada que es la institución del Jurado, de lo alta que debemos conservarla en cuanto a su integridad y su funcionamiento sirviendo de profilaxis al proceso de la búsqueda de la verdad legal. Por todos esos fundamentos, por entender que tengo discreción que está consagrada en la Jurisprudencia tanto en Puerto Rico como en Estados Unidos para así determinarlo, el Tribunal declara con lugar la solicitud del Ministerio Público y disuelve el Jurado en este caso."

Enjuiciado de nuevo el peticionario, solicitó la desestimación del proceso por razón de haber estado ya expuesto a ser castigado por dichos delitos. La Sala de instancia denegó la desestimación y expedimos *certiorari* para revisar ese fallo. La culpabilidad o la inocencia del peticionario aún no ha sido determinada en este segundo proceso. Sostiene ante nos que el Tribunal recurrido cometió error al declarar sin lugar la moción de exposición anterior ya que (1) el Juez que presidió el proceso no oyó prueba para decidir la solicitud de disolución del jurado y (2) no estuvo justificado al disolver el jurado "porque no había necesidad manifiesta, imperiosa, urgente, real o absoluta para hacerlo."

■ Los dos importantes valores en la administración de la justicia criminal que en situaciones como la del récord están presentes al disolverse un jurado y terminarse el juicio antes del veredicto,—de un lado, la garantía de la integridad del proceso y la justicia e imparcialidad del fallo para una y otra parte, y del otro, la garantía constitucional que acompaña a todo individuo de no ser "puesto en riesgo de ser castigado dos veces por el mismo delito", (1)—requieren que el

---

(1) Constitución del Estado Libre Asociado, Art. II, Sec. 11. *Downum* v. *United States*, 372 U.S. 734, 736, ". . . ya que la prohibición de la cláusula de doble exposición no es 'contra el ser castigado dos veces, sino contra el ser dos veces expuesto'. *United States* v. *Ball*, 163 U.S. 662."

juez que preside la causa haga la más completa depuración de la verdad de los hechos que se invocan para la disolución y terminación del proceso en protección por igual de ambos valores en juego y del interés tanto del Pueblo como del acusado. La debida sustanciación de los hechos y el establecer aquellos que sean ciertos, por métodos judiciales según dijimos en *Pueblo* v. *Rivera*, 67 D.P.R. 280 (1947), es fundamentalmente la responsabilidad del juez que preside, por cuanto sobre esos hechos ciertos así determinados ejerce él su función delicada y por lo regular nada fácil de dictaminar, en el ejercicio de una sana discreción, cuándo y hasta qué extremo están adversamente afectados la integridad del proceso y el pronunciamiento de un veredicto justo e imparcial para una y otra parte de modo que sea imperativa la terminación del juicio; aunque en ello vaya envuelta la garantía constitucional del ciudadano de no quedar en riesgo de ser castigado dos veces por igual delito. (²)

▪ En lo referente al primer error señalado, la posición que asumió la defensa según el récord pudo razonablemente hacer creer al juez que no hacía falta sustanciar con prueba las imputaciones del fiscal al jurado Sr. Rosado López. No obstante, la defensa asumió esa posición a los efectos de la sustitución de dicho jurado por otro, única solicitud hasta ese entonces hecha por el fiscal. En cuanto a la petición posterior de que se disolviera todo el cuerpo de jurados que entendían en la causa, pudo haber una más efectiva depuración y sustanciación de los hechos, negado por la defensa el más grave de ellos, y que se determinara a con-

---

(²) Además de que la doctrina concede firmemente esa discreción al Juez, la Regla 144 de Procedimiento Criminal autoriza la disolución de un jurado:" (d) si se hubiere cometido algún error o se hubiere incurrido en alguna irregularidad durante el proceso que *a juicio del tribunal,* le impidiere al jurado rendir un veredicto justo e imparcial", sin que ello impida un segundo juicio. Véase *Pueblo* v. *Arteaga Torres*, 93 D.P.R. 148 (1966).

ciencia mediante el correspondiente examen de sus miembros hasta qué punto en verdad todo el jurado había sufrido lesión en la encomienda de rendir un veredicto imparcial y justo. El efectivo esclarecimiento de la conducta de estos otros jurados así como la repercusión pública que ésa y las demás impu-fiscal dirigida al jurado Reyes Aquino, que creó en parte ese clima indeseable del proceso en que se basó el juez para terminarlo, resultó luego no tener fundamento.

■ Pero, básicas como son las anteriores consideraciones para un apropiado uso en ley de la facultad de terminar un juicio en circunstancias como las del récord, la cuestión a resolver ahora es más bien si, tomando en conjunto todos los hechos y circunstancias que el récord presenta, inclusive entre ellos la propia imputación no sostenida del fiscal contra un jurado que permanecía sirviendo y el efecto en ese jurado, así como la repercusión pública que ésa y las demás impu-taciones tuvieron en la prensa en forma destacada, y todas las demás eventuales consecuencias de esos hechos en el proceso, el juez tuvo o no base racional en el récord para actuar disolviendo el jurado en evitación, a su mejor enten-der, de un extravío de la justicia. (3)

---

(3) La edición de El Imparcial de 10 de abril de 1964 contiene el titular cubriendo toda la parte superior de la primera plana en letras de 1½ pulgadas de tamaño: "Fiscal Acusa a Dos Jurados". En la 3ra. página de la misma edición y en títulos a tres columnas: "Fiscal Pide Corte Elimine 2 Miembros del Jurado", más adelante; "Incidente muy Grave". En su edición del 11 de abril también a tres columnas el título "Eliminan Jurado y termina Crisis que planteó el Fiscal" en donde se dice que "de esta manera, el Juez Miranda cerró uno de los más graves incidentes que se han producido en muchos años en el Tribunal Superior durante la vista de un juicio por asesinato". Las ediciones de El Mundo del 10 y 11 de abril de 1964 en primera plana y en forma destacada: "Fiscal pide Sustituir Dos Jurados por Suplentes" y "Juez Sustituye por Suplente Jurado Comentó el proceso" donde se dice que la acción establece un precedente en los procesos criminales en Puerto Rico, y que era la primera vez en la historia judicial de Puerto Rico que un fiscal pedía al juez que sustituyera a dos jurados cuando ya estaba finalizando un juicio. Las informaciones daban detalles de las discusiones en corte en ausencia del jurado.

▮ La cuestión de cuándo los hechos y circunstancias surgidos en un caso, y qué motivos o causas hacen necesaria o apremiante la disolución de un jurado en situaciones como la presente, y cuando no, se nos muestra algo reñida en las colecciones de fallos. Existen principios o guías generalmente aceptados como normas doctrinales, pero en última instancia cada situación ha de resolverse con sentido realista a la luz de sus particulares circunstancias y hechos. Por ello, el margen de sana discreción reconocido al juez juzgador quien sin duda está en condiciones—más de lo que puede estar un tribunal de apelación a través de un récord—de recoger de cerca las palpitaciones vivas del proceso y de captar en el ambiente en que se desarrolla la causa con aquella sensibilidad propia del que siente la responsabilidad de que se haga justicia, el efecto que sobre la integridad o pureza de la misma puedan tener determinados acontecimientos.

En *Gori* v. *United States*, 367 U.S. 364 (1961), un caso en que tanto la Corte de Apelaciones 282 F.2d 43 (2d Cir. 1960), como el Tribunal Supremo dudaron de la necesidad y sapiencia de la acción del juez al disolver un jurado y no obstante ello sostuvieron la validez de un segundo proceso, se dijo:

"Desde 1824 ha sido la norma sentada por esta Corte que 'La disposición sobre doble exposición de la Quinta Enmienda . . . no significa que cada vez que a un acusado se le juzga ante un tribunal competente tiene derecho a quedar libre si el juicio no culmina en una sentencia final. ' [citas] Cuando, por fundamentos que el Juez juzgador considera constrictivos, quien está mejor situado para inteligentemente hacer esa decisión, los fines de una justicia sustancial no han de obtenerse sin desconti- nuar el proceso, puede terminarlo sin el consentimiento del acusado y aun contra su oposición y éste puede ser procesado otra vez compatible con la Quinta Enmienda. [citas] También está claro que 'Esta Corte por mucho tiempo ha favorecido la regla de la discreción en el juez juzgador para disolver el juicio y llamar otro jurado que juzgue al acusado si los fines de la

justicia quedan mejor servidos . . .' [citas] y que consecuentemente hemos rehusado escudriñar con severa actitud el ejercicio de esa discreción. [citas] En el caso de *Pérez* el autorizado punto de partida de nuestro derecho en esta esfera, el Juez Sr. Story expuso así, por una Corte unánime, los principios que desde entonces han guiado a las cortes federales al aplicar el concepto de la doble exposición a situaciones que han dado lugar a la disolución del juicio:

'. . . Creemos, que en todos los casos de esta naturaleza, la ley ha investido a las Cortes de justicia con autoridad para relevar a un jurado de dar un veredicto, cada vez que, en su opinión, tomando en consideración todas las circunstancias, hay una necesidad manifiesta para el hecho, o de otra manera se frustrarían los fines de la justicia pública. Deben ejercer una sana discreción sobre el particular, y es imposible señalar todas las circunstancias que harían apropiado el intervenir. De seguro, el poder debe usarse con la mayor cautela, bajo circunstancias urgentes y por motivos muy claros y evidentes; y, en casos capitales' especialmente, las cortes deben ser extremadamente cuidadosas en como intervenir con cualquiera de las oportunidades de vida, en favor del prisionero. Pero, después de todo, tienen el derecho de ordenar una disolución, y la seguridad que el público tiene del fiel, sano y consciente uso de esta discreción descansa en este, como en otros casos, en la responsabilidad de los jueces bajo el juramento de sus cargos . . . . .' 9 Wheat, a la pág. 580."

Véase la exposición de la doctrina ante variadas situaciones de hecho en otras expresiones recientes: *United States* v. *Tateo*, 377 U.S. 463; *Downum* v. *United States*, antes citado; *Green* v. *United States*, 355 U.S. 165; *Brock* v. *North Carolina*, 344 U.S. 424; *Bryan* v. *United States*, 338 U.S. 552; *Wade* v. *Hunter*, 336 U.S. 684; *United States* v. *DiFronzo*, 345 F.2d 383 (7th Cir. 1965), *cert. den.* 382 U.S. 829; *Killilea* v. *United States*, 287 F.2d 212 (1st Cir. 1961), una ilustrativa exposición del Juez Aldrich, *cert. den.* 366 U.S. 969; *Crawford* v. *United States*, 285 F.2d 661 (D.C. Cir. 1960); *Scott* v. *United States*, 202 F.2d 354 (D.C. Cir.

1952), *cert. den.* 344 U.S. 879; *State* v. *Puckett* (Ariz.), 377 P.2d 779, donde el juez que presidía el proceso sin jurado lo terminó debido a un artículo de prensa que implicaba que el fallo podría estar afectado por afiliación política; *State* v. *Romeo* (N.J.), 203 A.2d 23; *Commonwealth* v. *Maroney*, 230 F.Supp. 391 (W.D. Pa.), aff'd. 348 F.2d 22 (3rd Cir. 1964). Véase: *Pueblo* v. *Arteaga Torres*, 93 D.P.R. 148, antes citado.

En *Downum*, un caso en que se sostuvo la existencia de exposición anterior y se anuló el segundo proceso, el Tribunal expresó: (372 U.S. a la pág. 735)

"Desde *United States* v. *Pérez*, 9 Wheat 579, decidido en 1824, a *Gori* v. *United States*, 367 U.S. 364, decidido en 1961, se ha estado de acuerdo en que hay ocasiones cuando un segundo juicio puede obtenerse aunque el jurado que se insaculó para el primero se despachó sin llegar a un veredicto y sin el consentimiento del acusado. El ejemplo clásico es una disolución porque el jurado no puede llegar a un acuerdo. [citas] . . . El descubrimiento por el juez durante el juicio de que un miembro o miembros del jurado estaban prejuiciados en favor o en contra de una parte se ha considerado que autoriza la disolución del jurado y el ordenar un nuevo juicio. [citas] A veces el derecho valioso de un acusado a que se le termine su juicio por el tribunal específico que fue llamado a juzgarlo puede quedar subordinado al interés público cuando hay una necesidad imperiosa de que así sea. [citas] Han surgido diferencias en cuanto a la aplicación del principio. [citas] El hostigamiento de un acusado a través de sucesivos procesos o disoluciones de modo de proporcionarle a la acusación una oportunidad más favorable para condenar son ejemplos en que la doble exposición se adhiere. [cita] Pero esos casos extremos no fijan los límites de la garantía. La discreción para disolver un jurado antes de llegar a un veredicto debe ejercerse 'solo en muy extraordinarias y sorprendentes circunstancias,' para usar las palabras del juez Sr. Story en *United States* v. *Coolidge*, 25 Fed. Cas. 622, 623."

De ordinario las decisiones no presentan conflicto sobre las normas generales apuntadas. Las diferencias se notan al

aplicarse la norma general a situaciones específicas de hecho. Como el problema en estos casos gira en torno al uso de una sana discreción judicial, el ejercicio de esa discreción se enjuicia en la doctrina apuntada con sentido de mayor rigor y restricción a veces, otras con bastante laxitud y liberalidad. Aun cuando se trata de un derecho protegido por la Constitución federal fundamentalmente, las decisiones de las cortes estatales acusan, hablando en términos generales, un mayor rigor en el enjuiciamiento de la discreción del juez y un más severo escudriñamiento, en apelación, del ejercicio de la misma acorde con los conceptos enunciados, que lo que acusan las decisiones del Tribunal Supremo hasta los pronunciamientos más recientes para guía de las cortes federales. (⁴)

■ Independientemente de que, sujeto a criterios más exigentes en la doctrina y a otras actitudes aceptables en la evaluación y peso de las circunstancias aquí presentes, podía existir la posibilidad de haberse encarado la situación de otra manera y continuarse el proceso ofreciendo otros remedios y observando otras garantías y precauciones como sugiere y arguye la defensa; que quizás pudo haberse evitado una vez surgido el incidente que el jurado se enterara de sus pormenores, y aun de que actuando en primera instancia pudiéramos haber tenido otro criterio de la situación en general o tomado

---

(⁴) Sería interminable comparar todas las situaciones de hecho envueltas. Para algunos ejemplos ilustrativos del mayor rigor que presentan los casos estatales contra la terminación del juicio y en la evaluación de la discreción del juez a la luz del concepto de la necesidad manifiesta e imperiosa de hacerlo, y el motivo claro y evidente: *Paulson* v. *Superior Court, etc.* (Cal.), 372 P.2d 641; *Jones* v. *State* (Ark.), 320 S.W.2d 645; *State* v. *Preto* (N.J.), 144 A.2d 19; *State* v. *Connors* (Wash.), 371 P.2d 541; *State* v. *Crocker* (N.C.), 80 S.E.2d 243; *Baker* v. *Commonwealth* (Ky.), 132 S.W.2d 766; *Cardenas* v. *Superior Court*, 363 P.2d 889, donde la Corte Suprema de California (In Bank) se negó a seguir a *Gori* v. *United States*, ante, por no responder este fallo a la interpretación dada por California a la Cláusula de doble exposición de su Constitución estatal.

medidas distintas para la protección de las partes sin terminar un largo y prolongado juicio ya en su etapa final, estamos convencidos por el récord ante nos que el magistrado que presidía no estaba carente de base racional en los hechos para ejercer su discreción disolviendo finalmente todo el jurado y terminando la causa, en su honesta creencia y convicción de juzgador de que así se servirían mejor los fines de la justicia y así él protegería mejor los intereses de las partes.

■ Tomando la situación y el ambiente creado en su conjunto y aparte el hecho de cómo mejor pudo manejarse la misma, no puede decirse que la determinación del juez fue un acto meramente caprichoso y sin fundamento o que respondiera a motivación distinta sino el salvar la integridad del proceso y asegurar en su día un fallo justo. Existiendo como existe base racional en el récord para su actuación, la diferencia de criterio que en todo caso pudiera haber entre su juicio y el nuestro en revisión sería una diferencia sólo de grado en la apreciación de los factores aludidos y, en deferencia a su posición de observador perspicaz de los hechos ocurridos y sus consecuencias sobre el proceso, no deberíamos sustituir su juicio.

Como se ha dicho en fallos citados, en estos casos no pueden haber fórmulas rígidas y es imposible anticipar todas las circunstancias que justificarían o no una intervención del juez para terminar el proceso. No es necesario el atarnos *a priori* a una determinada posición en la doctrina para la solución de estas situaciones. Sin descartarse los principios normativos de derecho que deben regir, la norma de acción propia a seguirse debe ser aquélla que a la luz de los hechos y circunstancias presentes en cada caso conserve y proteja mejor los valores de la justicia criminal a que aludimos al principio colocados en la balanza. Lo anteriormente expuesto dispone del segundo error señalado.

Acordes con lo expresado por el magistrado que presidía la vista en que es preciso conservar muy en alto la integridad

del jurado, a sus palabras finales de admonición conviene añadir que no conduce a un clima de buena salud y probidad del proceso y puede ser lesivo a esa misma integridad el que el jurado sea puesto o tenido bajo la vigilancia de agentes informadores al servicio particular de cualquiera de las partes en el litigio y para beneficio de éstas. Sólo debe haber con el jurado aquella intervención que conforme a la ley, disponga el tribunal. Aun cuando ello respondiere a un exceso de celo en el desempeño del deber, tales prácticas no deben ser ignoradas o permitidas por los jueces de instancia.

*La resolución recurrida debe sostenerse. Se anula el auto de certiorari expedido, y se devolverán los autos al Tribunal de instancia para que juzgue la causa en sus méritos.*

El Juez Presidente Señor Negrón Fernández disintió.