William J. KILLILEA, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

John H. CHAMBERS, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Anthony BARBANTI, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

James J. McLEAN, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 5610, 5611, 5614, 5615.

United States Court of Appeals First Circuit.

Feb. 23, 1961.

Daniel F. Featherston, Jr., Boston, Mass., with whom Choate, Hall & Stewart, Boston, Mass., was on the brief, for William J. Killilea and John H. Chambers, appellants.

Francis J. DiMento, Boston, Mass., with whom DiMento & Sullivan, Boston,

Mass., was on the brief, for James J. McLean, appellant.

Jackson J. Holtz, Boston, Mass., with whom Holtz, Sullivan & Zonderman, Boston, Mass., was on the brief, for Anthony Barbanti, appellant.

William J. Koen, Asst. U. S. Atty., Boston, Mass., with whom Elliot L. Richardson, U. S. Atty. and Thomas P. O'Conner, Asst. U. S. Atty., Boston, Mass., were on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

■ This is an appeal by four defendants from convictions under an indictment for larceny of some 750 cartons of whiskey which were being moved in interstate commerce on consignment from Hiram Walker Company of Illinois to a wholesaler in Boston. 18 U.S.C. § 659. As a preliminary matter we must decide whether the court correctly denied a pretrial motion to dismiss. This motion was based on a mistrial order which had been granted, over the objection of the defendants, during the trial of an earlier indictment for conspiracy to steal this same liquor. It is agreed that the facts and circumstances and the evidence, so far as material, were essentially the same in both cases. The defendants claim double jeopardy and related defenses.

The mistrial occurred as follows. Trial of the conspiracy case commenced on November 19, 1958, to a jury of twelve and two alternates, and proceeded on November 20, 21, 24, 25, 26, and December 1, 4, 8, 9, and 11. During the midmorning recess on December 11 the clerk discovered that a woman who had been frequently seen in the courtroom during the trial was the wife of one of the twelve jurors, and reported this fact to the court. The court immediately summoned counsel to the bench and a lengthy conference took place in the absence of the jury. It was agreed that until then no one at the conference had been aware of the identity of the wife. The principal subject of discussion was mistrial. No one formally moved for mistrial, and initially all counsel took the position that the problem created was a difficult one and that it was for the court to decide. It was common agreement that, throughout the trial, many significant matters which the jury should not have heard had taken place in open court with the jury excluded, but within the hearing of spectators. Discussion ensued as to whether the wife would have communicated the substance of such proceedings to the juror, and whether the juror would have communicated such information to other jurors during subsequent recesses. The court stated that on a number of occasions it had instructed the jury that they were not to talk about the case with anyone, not even their wives; that it could not believe that this juror had followed these instructions; that it believed the jury would know the wife had been there, and that it felt certain the juror would have talked. It stated that if the wife were to deny conversing with the juror about what had occurred in his absence it could not believe her, and that if the juror should deny communication with the other jurors it would have to feel that such denial was prompted by a desire to protect himself, since inquiry of the juror would indicate that "he had been disobeying my mandate" and "obviously he is going to rush to his own defense." The court pointed out that even to make inquiry of the juror would get back to the other jurors, and might have incalculable effects.

As the discussion proceeded the several counsel for the defendants took somewhat different positions. One seemingly wished the case to proceed as if nothing had happened. Another suggested that this particular juror be excused and an alternate substituted. Another felt that if the juror were interviewed and admitted communicating with the other jurors there should be a mistrial. One counsel stated that he would affirmatively object to a mistrial, adding that if a mistrial were granted, and if later, "on close examination of the law I find it produces

a defense for any claim of double jeopardy, even as a highly technical matter, I think we can agree I shouldn't close the door on the possibility of ultimately presenting that." The court objected to this statement, saying that it wished to settle the matter finally one way or the other. The United States Attorney said little except to indicate that some of the matters overheard by the wife might have been prejudicial to the government rather than to the defendants.

██ After the noon recess the court interrogated the wife in the absence of counsel, but in the presence of the court reporter. This had the endorsement of all counsel with the exception of one, who objected to his exclusion.[1] In this examination the wife stated that she had been in court during most of the trial, had heard many of the matters which transpired during the jury's absence, and, in general, had discussed these matters with her husband. She also stated that she had told her husband what she thought of the testimony and of the witnesses. Thereafter the court had the reporter read its questions and the wife's answers to counsel, and then stated that it would declare a mistrial. Counsel for two of the defendants respectively announced that their clients objected and did not consent. Counsel for the other two defendants stated, "I think that the next step should be to call in the juror and examine him, and that failing, that there was no necessity for a mistrial, perhaps." This suggestion was then adopted by the other two counsel in addition to their formal objections. The court thereupon called the jury and declared a mistrial, stating, "All the rights of the defendants are saved."

The present indictment was returned in March 1959. The defendants argue that, although this charges a different and separate offense, the circumstances are so closely related that if they could not lawfully be retried on the conspiracy indictment, they could not be tried on this one either. They rely on the separate concurring opinions of Mr. Justice Brennan in Abbate v. United States, 1959, 359 U.S. 187, 196, 79 S.Ct. 666, 3 L.Ed.2d 729, and Petite v. United States, 1960, 361 U.S. 529, 533, 80 S.Ct. 450, 4 L.Ed.2d 490. For present purposes we shall assume, without in any way implying our agreement, that this is a correct statement. We shall also assume not only that none of the defendants consented to the mistrial, but that all of them affirmatively objected.

██ We start by conceding that defendants' constitutional freedom from being twice put into jeopardy for the same offense may be invoked though the "first" trial has been terminated short of final determination. See Wade v. Hunter, 1949, 336 U.S. 684, 688, 69 S.Ct. 834, 93 L.Ed. 974 (dictum); Kepner v. United States, 1904, 195 U.S. 100, 128, 24 S.Ct. 797, 49 L.Ed. 114 (dictum); Mayers & Yarbrough, Bix Vexari: New Trials and Successive Prosecutions, 1960, 74 Harv. L.Rev. 1, 3 n.10, 8. However, it has long been settled that in particularly demanding situations a mistrial may be declared and a new trial prosecuted without being tainted by the Fifth Amendment prohibition against double jeopardy. Wade v. Hunter, supra; United States v. Perez, 1824, 9 Wheat. 579, 22 U.S. 579, 6 L.Ed. 165. These cases seem to recognize that the defendant has in fact been subjected, at least in part, to the very type of continuing harassment which the amendment is designed to prevent, but that the exigencies of public justice outweigh the defendant's disadvantage in the particular case. See e. g., Green v. United States, 1957, 355 U.S. 184, 216–219, 78 S. Ct. 221, 2 L.Ed. 199 (Frankfurter, J., dissenting); Wade v. Hunter, supra, 336 U.

---

1. We do not approve of a judge examining anyone in a criminal case in the absence of counsel, at least without the wholehearted consent of all counsel. Here the examination was transcribed. We believe the examination was fair, and we hold the error was not prejudicial. Indeed, in view of her almost constant attendance at the trial, we might have shared the court's announced skepticism of her veracity had her statement proved to have been any different.

S. at pages 688–689, 69 S.Ct. at pages 836–837. Consistently with this, the trial judge's power to stop a trial short of verdict, though discretionary, must be exercised with scrupulous restraint. See, e. g., Wade v. Hunter, supra, 336 U.S. at page 690, 69 S.Ct. at page 837.

The court's belief that the matters discussed in the jurors' absence would be communicated to them seems a very reasonable one, and, in our opinion, the court perceptively analyzed the entire situation. There is a high degree of probability that, in the frequent recesses which occur during a three-week-long trial when the jurors are confined in the jury room, and doubtless wondering what is taking place in their absence, a juror who has a pipeline to the courtroom in disobedience of the court's order is not going to be silent. Not only would the jury have had their attention brought to matters which they should not have considered, but they would have condoned the manner of its bringing. A court might well conclude that such a jury ought not to sit. The suggestion made by some of the defendants below, and now adopted by all here, that the court should have excused this one juror, and promoted an alternate, seems unrealistic.

We must consider the hardship to defendants. The defendants' essential claim is as to the "lengthy trial and impoverished defendants, factors of ordeal, harassment, anxiety and insecurity." We do not find these insubstantial matters. They are a large measure of the substance of what the double jeopardy provision is intended to prevent. See Note, 1956, 65 Yale L.J. 339. But, comparatively speaking, eleven wasted trial days are dwarfed by the prospect of several years in jail in case of a miscarriage of justice. There was no suggestion that any defendant would be disadvantaged by a second trial by reason of any favorable circumstance that had taken place, the benefit of which might be lost upon retrial. No defense witness had testified, so that the only evidence which had been disclosed was that of the government. Finally, there is no room for even a sug-

gestion that government counsel were in any way responsible for the mistrial. Compare United States v. Gori, 2 Cir., 1960, 282 F.2d 43, 48 (dissenting opinion), certiorari granted 81 S.Ct. 282.

■ The defendants contend, nevertheless, that to permit a judge to declare a mistrial over a defendant's objection will tempt him to subject "a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." Green v. United States, 1957, 355 U.S. 184, 188, 78 S.Ct. 221, 224, 2 L.Ed.2d 199; cf. Brock v. State of North Carolina, 1953, 344 U.S. 424, 429, 73 S.Ct. 349, 97 L.Ed. 456 (concurring opinion). This contention proves too much, and not enough. Too much, because it would mean that a mistrial could never be declared over the objection of a defendant, which is certainly not the law. See Wade v. Hunter, supra; Thompson v. United States, 1894, 155 U. S. 271, 15 S.Ct. 73, 39 L.Ed. 146; Simmons v. United States, 1891, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968; cf. State of Maine v. Slorah, 1919, 118 Me. 203, 216, 106 A. 768, 4 A.L.R. 1256. Not enough, because there is no basis for suggesting that this was what happened here, or that any counsel had any such thought. Indeed, the claim is advanced even now only as a general proposition, and not as applicable to the facts of this case. The court was not compelled to accept defendants' determination that they preferred to waive all irregularity and error. Even if it be assumed that the prejudice had been solely to defendants, the momentary waiver of rights will not necessarily estop a defendant from thereafter reclaiming them. Cf. Brown v. State of Mississippi, 1936, 297 U.S. 278, 286–287, 56 S.Ct. 461, 80 L.Ed. 682. While a defendant may, if acting competently and freely, waive various rights, we believe that this can only be done when what is left is a judicial forum and a rational means of determining guilt or innocence. Thus, in order to avoid recommencing the trial, a defendant may elect to continue with eleven jurors, Patton v. United States,

1930, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854, or he may elect to be tried by the court or to represent himself rather than take assigned counsel, Adams v. United States ex rel. McCann, 1942, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268. But we have grave doubts whether a defendant could bindingly elect to be tried by a jury substantially infected by prejudicial exposure or by one of demonstrated indifference to its judicial obligations, any more than he could assent to the toss of a coin or the throw of a card. As we cannot say that the court here could not properly have concluded that trial by this infected jury had been converted from a traverse to a travesty, we hold that a mistrial and second trial did not subject defendants to a second jeopardy in violation of the Fifth Amendment.

■ We must consider, therefore, the errors alleged to have arisen during the second trial. A major contention urged by defendants is that they were deprived of a proper trial by the unfairness of the trial judge. At the outset of their argument they state that, "regrettably," it is necessary for us to read the transcript from cover to cover. But we regret even more that counsel has found it necessary to itemize no less than 593 instances of alleged judicial misconduct, on the ground that cumulatively, if not individually, these demonstrate their point. Some of these events should not have occurred.

But counsel's selective process exhibits a sensitivity surpassed only by the famed princess and the pea. The great number of cited instances to which we can see no conceivable objection not only unnecessarily consumed our time, but by their assertion below unduly prolonged the trial. One defendant constantly objected, for example, to the court's attempt to inform the jury in the course of the trial as to the legal issues, or the relevance or purpose of certain testimony—not on the ground that the instructions were erroneous, but simply on the claim that no such elucidation should occur until the last day of trial. This continued insistence could not but tend to annoy the court, and eventually, perhaps, lead it to do things it otherwise would not have done. So, too, the vigorous raising of legal issues that were without foundation.[2] While we do not endorse many of the things that the court did, with which we will deal presently, we are not out of sympathy with the charge by the government that defendants, either consciously or unconsciously, contributed to, if they did not, indeed, originate, some of the matters to which they now object.

This applies particularly to alleged unfair treatment of counsel. On occasion the court was not fully restrained. We note that many times the court instructed counsel to be seated. It should rarely be necessary to speak so peremptorily to

2. Admittedly, the matter of interstate commerce was a jurisdictional issue under the indictment. According to the government's testimony the liquor was stolen from a local warehouse where it remained in the vehicle in which it had been transported from Illinois, awaiting delivery to the consignee. The court properly instructed the jury that it must determine whether the liquor was in commerce, i. e., whether the government's evidence was correct. The issue that the defendants sought to raise periodically during the trial—and again, here—is that even assuming that evidence to be correct, the movement in commerce may have ceased. They assert that the liquor may have been held a few days longer than need be, and that this may have been at the request of the consignee because of unreadiness to receive it, and

hence that there was constructive delivery terminating the interstate commerce. However, the defendants never properly sought to show such facts in a manner sufficient to save their rights. Worse, their contention appears entirely without legal merit. See Walling v. Jacksonville Paper Co., 1943, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460; State of Minnesota v. Blasius, 1933, 290 U.S. 1, 5–7, 54 S.Ct. 34, 78 L.Ed. 131; Swift & Co. v. United States, 1905, 196 U.S. 375, 398–399, 25 S.Ct. 276, 49 L.Ed. 518; Sucres. De A. Mayol & Co. v. Mitchell, 1 Cir., 1960, 280 F.2d 477, certiorari denied 364 U.S. 902, 81 S.Ct. 235, 5 L.Ed. 2d 195. The defendants cite no case to the contrary. Yet discussion of this matter below occurs in at least six places in the record and engendered considerable heat.

counsel. On the other hand, we note that counsel frequently continued to press objections long after the court had ruled, and occasionally did not sit down when ordered to do so. We note, also, that a number of times, with no provocation, counsel shouted at the court. Counsel's explanation that this was necessary in order to be heard above the court (*i. e.*, successfully to interrupt), scarcely improved matters.[3]

Of course it is the court which is primarily responsible for good order and decorum in the courtroom. Several times the court remarked that the trial was becoming a "three-ring circus." But instead of taking tangible steps, the court stated that it did not propose to be disciplinarian like other judges. The most it did (which it did quite frequently), was to threaten counsel with the marshal, either unjustifiably,[4] or justifiably, but without following up, making a bad situation doubly bad. Nevertheless, although we hold the ultimate responsibility to be the court's, we do not suggest that defendants can lower the tone of the trial,

and then turn and complain of what they themselves caused. While we by no means imply that all of the criticism of counsel was justified, or invited, we are not satisfied that the court's actions which were directed towards counsel personally, but were not prompted by them, prejudiced the defendants.

When we come to the question of whether defendants received a fair trial from an impartial judge, we have another matter. The comments of the judge as they appear in the record often would have been questionable even coming from a prosecuting attorney. The only difficulty government counsel had with the court was in restraining it from going too far in the government's favor. Defense counsel's difficulties were quite different. Defendants were constantly restricted, sometimes beyond any bounds of discretion. Evidence offered by them was ruled out even without objection by the government—or after objection was invited by the court—while the only interruption of the government's examination was to ask questions so helpful that

---

**3.** In fairness to counsel now of record, we should acknowledge that none of them was guilty of this offense. Moreover, it was not always easy to speak to the court. See note 4, infra.

**4.** As an example, by no means untypical, near the close of the government's case the court demanded that all defendants state on the record before the jury whether they were going to rest. One counsel replied that the request was premature. The Court. "I am directing you to tell this court whether you are resting." Counsel. "I am not prepared to state." Court. "I will give you five minutes to tell me. I am not going to have any doubt about it." Counsel. "Under your Honor's—" Court. "I am directing you to tell me whether or not you are resting." Counsel. "Under your Honor's ruling—" Court. "I don't want any comment. I know what I am doing." Counsel. "May I make a statement for the record at the bench?" Court. "No. That is the question that is asked, and I won't tolerate any more of this from you or anybody. Are counsel ready to rest?" Counsel. "In answer to your Honor's—" Court. "I have told you to answer the question." Counsel. "I am

trying to." Court. "I have to ask it, as a matter of law. Are you resting or not, or are you going to put on evidence?" Counsel. "Under duress I rest at this time, your Honor. I don't think—" Court. "I am going to ask you to disregard that thoroughly." Counsel. "This is not the way to do this, your Honor, with all respect." Court. "You sit down or I will order you out of this case. That is an unworthy statement * * * Mr. Marshal, I want you to go over and if he stands up again I will order him removed from this courtroom." After some continuation of this procedure it suddenly occurred to the court that its request had in fact been premature. There was a conference at the bench, following which the court said to the jury, "Obviously I have never talked to the attorneys. [Counsel] has given me a very solid reason why he couldn't determine whether or not he would rest. He has a right not to rest until the time comes [for him] to present his case * * * I would have been happy to have accommodated him * * If he had stated [his] reason, I would have recognized it."

they would have been objectionable had they been asked by counsel.[5] Cross-examination of government witnesses was continually cut off—in some instances when it was apparent that the court could not have known what the question was going to be. Defense witnesses, on the other hand, were subjected to rigorous cross-examination by the court itself.[6] When it would have been altogether too blatant to cut off cross-examination of government witnesses, the court frequently interrupted at important moments, giving the witness an opportunity to recover himself, or would itself supply the answers, or explanations, effectively destroying the cross-examination.

A peculiarly objectionable matter of which we should make special mention was the court's repeated announcement that it was serving the interest of the defendants. It should scarcely have been necessary to protest so much, but we cannot assume that the jury was in this respect a sufficiently sophisticated audience. Particularly offensive and, we believe, highly prejudicial, were the court's remarks on more than one occasion, in the presence of the jury, that in ruling *against* defendants' counsel it was doing so "to protect the interests" of their clients. If it is conceivable that this could ever be so, such aggrandizement of the court, and criticism of counsel, should never be made in public. We hold that defendants are entitled to a new trial before some other judge. ·

Judgments will be entered vacating the judgments of the District Court, setting aside the verdicts, and remanding the cases to that court for further proceedings consistent herewith.

5. We do not mean to imply by this that the court would have sustained such objections. The court frequently announced that the government might lead its witnesses even when the government had not asked to do so and when there was no possible justification for it. When defendants objected to this on one occasion, the court remarked that an Assistant U. S. Attorney would never ask an improper question. The court also publicly criticized counsel for suggesting that an FBI witness might not tell the truth.

6. While the court announced on one occasion that "firmness on the part of a judge to check prolixity is an absolute essential," it applied this rule almost exclusively to the defendants, rarely to the government, and seemingly never to itself. One example will suffice. The defendant Barbanti called as a witness one Vendetti, who testified that in 1957 he was a race-horse trainer. The court thereupon took over the examination. It asked the witness whether he was married, and on learning that he was not, asked him with whom he roomed, how old he was, what horses he was in charge of in 1957, to whom they belonged, where they raced, and how many races they won in 1957. On learning that collectively the witness's two horses won only one race (for $1250), with no place or show, the court inquired how much a day the witness received for training them and how long the meet was. In the course of nine pages of transcript the court referred six times to the fact that in sixty days one horse won one race, and the other none, and that for this the witness received $16 a day less expenses. The court asked for the present address of the owner of the horses (with whom witness was no longer connected), and repeatedly emphasized that the witness did not know it. When defendant finally had an opportunity to examine his witness he sought to show that one of witness's horses won a $15,000 stake in 1958, in order to rehabilitate him after the court had undermined his value as a witness. The court not only excluded this testimony, but took offense, saying to counsel, "I gave you a lot of warning, I don't want you to repeat that statement again or I'll sit you down and I'll ask someone to carry on." (This ruling, under the circumstances, was clearly wrong, and taking offense was worse.) The witness then testified to an alibi for Barbanti. The court thereupon undertook cross-examination for several pages, concluding his questions by asking the Assistant U. S. Attorney, "Have you finished?" The Assistant U. S. Attorney correctly replied, "I haven't even started," and asked two questions, there being, quite obviously, nothing more to ask.