400 F.2d 58
 NEW ENGLAND ENTERPRISES, INC., et al., Defendants, Appellants,
v.
UNITED STATES of America, Appellee.
Kenneth R. BAUER, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
Robert L. MARQUIS, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
Eugene L. MICHAUD, Defendant, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 7079-7082.
 United States Court of Appeals First Circuit.
 August 20, 1968.
 Certiorari Denied January 13, 1969.
 
 See 89 S.Ct. 654.
 COPYRIGHT MATERIAL OMITTED Stanley M. Brown, Manchester, N. H., with whom Charles A. DeGrandpre and McLane, Carleton Graf, Greene & Brown, Manchester, N. H., were on brief, for appellants.
 John Wall, Special Asst. U. S. Atty., with whom Louis M. Janelle, U. S. Atty., and William H. Barry, Jr., Asst. U. S. Atty., were on brief, for appellee.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 Appellants are a New Hampshire corporation, New England Enterprises, Inc. (New England), two of its officers and three of its sales managers. Together with defendant Interstate Engineering Corporation (Interstate), not a party to this appeal, they were convicted under the federal Mail Fraud Act, 18 U.S.C. § 1341. They claim error in the trial below in the following respects: that the district court failed to apprise the defendants of the nature of the case against them; that the jury impaneling practice followed by the court was contrary to Fed.R.Crim.P. 24(b); and that various errors were committed by the court in the conduct of this seventeen day trial.
 
 
 2
 The indictment charged defendants, among other things, with devising and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises from some seventy-seven married couples and three individuals. The nature of the scheme was stated to be defendants' inducement, through misrepresentations and omissions to state material facts, of the signing of installment sales contracts for the purchase of Compact vacuum cleaners, manufactured by Interstate and sold through New England, a local distributor, and its various salesmen. In particular, appellants were charged with carrying out a promotional scheme in which prospective buyers were told that they could acquire a vacuum cleaner, listed at and said to be worth $269, for only $19.90 plus the submission of names of other prospective buyers to advance New England's advertising campaign which would assuredly yield enough bonuses to cover or exceed the list price of the cleaner. Other allegations of deception, including failure to state the effect of the endless chain aspect of appellants' referral program,[1] a charged misrepresentation as to the manufacture of the machine's motor, the suggested illegality of certain Cadillac, television and green stamp contests, and the establishment of an inflated sales price were stricken from the indictment and withdrawn from the jury's consideration.
 
 
 3
 The working of the scheme was illustrated by the following evidence elicited from a series of government witnesses who had been appellants' customers. Prospective customers would receive through the mail a card signed by a friend or relative who was already a Compact purchaser. The card, while not identifying New England by name or in any other way, invited the recipients to win a Cadillac or color television set and informed them they would be called by telephone for an appointment. In the subsequent telephone call a New England operator or salesman would provide no more detailed information, except to say that the product he or she had was new and revolutionary and that it could only be promoted through personal home visits. Appointments were arranged for a time when both husband and wife were expected to be in. The salesman would enter empty-handed and begin his "Front Talk" as prepared by New England. His purpose at this stage was to arouse the interest and curiosity of his hosts by explaining that he was working to establish a brand name for a new product yet to be shown in the area; that the product was manufactured by Interstate, a California corporation which at one time manufactured airplanes and parts but, because of the war's end and the loss of government contracts, decided to enter a new field; that Interstate, after study and analysis, developed a unique product in an area shared by 119 other companies but which had nevertheless caused housewives much dissatisfaction; that Interstate, in order to establish a brand name, needed to advertise; that conventional media advertising resulted in a money drain without appreciable market gain; that Interstate now found that the most effective way to advertise was by "word of mouth"; and that if the salesman's listeners would agree to tell others of this product he would show them how to make some of the advertising money Interstate had previously wasted.
 
 
 4
 The salesman would then go to his car and return with a Compact cleaner which he would demonstrate. Either during or after the demonstration he would ask his prospects how they would like to own the cleaner for $19.90 — always asserting, however, that it was not for sale. In time he would offer it for $19.90, which offer, he said, was good only that evening. If his hosts expressed an interest he would tell them about the bonus program for referrals — $25. for each referral sale made — and would illustrate with the following example from the "Closing" of New England's sales manual:
 
 
 5
 "Now let's say you send us to see 50 people * * * at least 50% will Qualify/that's 25 times $25 is $625 * * * could you use that kind of money * * *"
 
 
 6
 The customers would be required to sign a conditional sales contract, represented as a "bond of friendship" and said to be necessary to motivate them to send out referral cards since "people are basically lazy". Some purchasers testified that they never understood they were signing a contract and explained that, even if they tried to read it before signing, the salesman engaged them in conversation making concentration difficult or impossible. Others testified that, though they realized they were signing a sales contract and even questioned the salesman about the possibility that he might not sell to enough referrals to cover the cost of their Compact through bonus repayments, the salesman answered that their only concern was to produce names and addresses and to "leave the rest to me".
 
 
 7
 In essence it was this program, explained with some slight variation by the different government witnesses, which the government was ultimately permitted to argue to the jury as the scheme to defraud. As the government's evidence further disclosed, New England's experience was that twelve per cent of the referrals, not fifty per cent, resulted in sales. Hence, purchasers generally received few, if any, bonus repayments. In fact, in order to receive ten such repayments, the number necessary to reduce the cost of the Compact to $19.90, each purchaser would have had to submit between 80 and 85 cards.
 
 I. NOTICE OF PROSECUTION'S THEORY
 
 8
 We turn first to a consideration of appellants' claim that prior to the instruction of the jury they were never made aware of the charge and nature of the evidence against them and hence were deprived of an opportunity to prepare an adequate defense. It is important in connection with this argument that we make perfectly clear what is at issue and what is not. We are concerned only with the sufficiency of disclosure of the theory of the case upon which appellants were ultimately convicted. Accordingly, we ask: can it be determined from the pleadings, statements and orders of the court, and the nature of the appellants' defense, whether appellants were in fact so plainly uninformed? It is wholly irrelevant whether or not appellants were adequately apprised of the government's alternative theories, all of which were ultimately withdrawn from the jury's consideration. There is no prejudice in a court's trimming an indictment charging several acts of fraud where the court during the course of the trial determines that certain allegations will not lie as a matter of law and either announces its decision to counsel prior to the introduction of evidence bearing on them or, to the extent such evidence is placed before the jury, effectively strikes it by appropriate instruction.
 
 
 9
 The indictment was returned on April 4, 1966. A Bill of Particulars, requested by Interstate, was filed by the government the following November 14, and a further Bill, requested by all defendants, was denied on March 15, 1967. The judge who presided at the trial of this case was so assigned on April 25, 1967 and on May 19 and May 22 issued pre-trial memoranda explaining his view of what the government alleged to be defendants' scheme to defraud. Both memoranda were withdrawn by letter of June 13, 1967. Two days later appellants moved for a second Bill of Particulars, which Bill was submitted June 19 and filed June 20, 1967. Trial began on June 19 and ended July 21.
 
 
 10
 Appellants first contend that they were unable to glean from the indictment itself or the government's first Bill of Particulars the nature of the scheme to defraud charged against them. We find those two documents more instructive than appellants are willing to concede. First, two paragraphs of the indictment directly charge misrepresentation of ultimate cost. Paragraph 14 states that it was a part of the fraudulent scheme to "mislead * * * prospective purchasers into believing that, because of the operation of the referral plan, they would obtain the Compact vacuum cleaner for only $19.90, and that any other costs would be recouped through bonus-commission payments of $25.00 each by merely sending * * * letters to their best friends, and further, that the purchasers would likely receive additional income." Paragraph 20 alleges that "[i]t was a further part of the scheme * * * that the defendants, aided and abetted by each other * * * made the following false and fraudulent * * * representations * * * in the sale of Compact vacuum cleaners by the referral method * * *
 
 
 11
 * * * * * *
 
 
 12
 "(j) That if the purchaser of a Compact vacuum cleaner furnished the names of 50 people as prospects, all of these 50 people would be contacted by the defendants, and that at least 50% of these prospects would be sold a vacuum cleaner which would result in the person furnishing the names being paid 25 bonuses of $25.00 each, for a total of $625.00.
 
 
 13
 "(k) That the only reason the signature of the purchaser was required on a sales contract was to `motivate' them to send out referral cards to new prospects."
 
 
 14
 While these two direct references are themselves significant, they take on even more meaning when viewed in light of the government's disclosure, made in its first Bill of Particulars, that it considered certain designated New England sales manuals, and specified paragraphs therein, to be fraudulent. These manuals contained an outline of the approach used and representations made by appellants at home demonstrations, which we summarized earlier. Not only were these answers sufficient to suggest to appellants that the government considered the portion of the indictment charging such misrepresentations a live issue but, perhaps more important, effectively put appellants on notice as to their alleged part in the fraudulent scheme since the specified documents were products of their authorship.
 
 
 15
 Appellants suggest, however, that the district court's subsequent issuance and withdrawal of the two pre-trial memoranda, referred to above, confused the situation by suggesting but one theory of proof, different from the misrepresentation claim upon which the case went to the jury, and about which the court expressed substantial doubt. The first memorandum dealt with the endless chain theory of fraud and appears to have communicated a tacit approval of the legality of its use in this case. The second memorandum indicated a modification of the court's view of the government's position; it suggested the fraudulent scheme was either tied to the omission of material facts (endless chain theory) or the misrepresentation of actual experience. These efforts provoked a memorandum from Interstate analyzing the endless chain theory and contending for its invalidity. The court, apparently impressed with Interstate's argument, withdrew both memoranda. We think the court's action here constituted not an expressed inability to understand the government's case but an implied doubt as to one important facet of it, namely, the endless chain aspect.
 
 
 16
 Appellants then sought further amplification of the government's case and moved for an additional Bill of Particulars stating "the essential respects in which the scheme alleged in the indictment is fraudulent." The government complied shortly before trial began on June 19, 1967. Its Bill described the essence of the scheme as the "obtaining of money from victims by representations to them that they would receive vacuum cleaners at little or no cost by `enrolling' in an `advertising program' whereby the victims would supply to the defendants the names of other potential `enrollees' in the `advertising program'." It further went on to describe a two-level structure:
 
 
 17
 "* * * one a `paper' level (and in which Interstate supplies its distributors and their salesmen with printed sales pitches, manuals, contest materials, instructions and other paraphernalia) with the dual purpose of (a) defending against lawsuits, and (b) facilitating and encouraging the operation of the second level, which involves actual misrepresentations and concealments of material facts as well as misleading statements in the recruitment of prospective `enrollees' into the `advertising program.'"
 
 
 18
 Appellants construe this Bill of Particulars as a contention by the government that Interstate devised the scheme to defraud and that local distributors, here New England, made the actual misrepresentations and concealed material facts. We think this too narrow a reading. The reference to Interstate simply makes specific its alleged "paper level" role; it does not limit "paper level" participation to Interstate alone. Nor does the "second level" exclude the devising of a scheme differing in some particulars from Interstate's. More instructive to our mind is the final reference to "actual misrepresentations" and "concealments of material facts" which, in view of all the information available to date, could refer to nothing other than the two major theories pursued by the government; misrepresentation of actual enrollment experience statistics and concealment of the exhaustibility of referrals (endless chain).
 
 
 19
 Pre-trial history aside, appellants argue that during the course of the trial itself they "were confronted with a constantly changing definition by the District Court of the fraudulent scheme against which they were required to defend themselves." Again, we do not see this as an accurate statement of the case. The court's view of the fraudulent scheme never changed once it had the benefit of the government's second Bill of Particulars. It recited from the Bill during the impaneling of the jury and had copies distributed to the jury on the third day of trial so that they would not be misled as to the "primary thrust" of the case as they listened to the testimony of a government witness, a former employee of New England, who described the home demonstration sales talk used by appellant Marquis. On the seventh day of trial the court again referred to the Bill of Particulars and, with respect to the nature of the misrepresentations alleged therein, sought to distinguish between possible lines of attack open to the government but which did not yet have an evidentiary basis on the one hand — namely, misrepresentation of the value of the Compact cleaner — and what it considered the "thrust of the case" on the other: "representations to so-called victims, that they would receive vacuum cleaners at little or no cost by participating in an advertising program."
 
 
 20
 Other statements by the court, most of them made out of the hearing of the jury, are not to the contrary.[2] In fact, there is ample evidence that counsel for appellants understood full well what the court had in mind on these several occasions. If his enlightenment did not come from the court it was nevertheless manifest throughout. During the course of the government's direct presentation — in large part a parade of "victim" witnesses who described the sales presentation of appellants and their own understanding of their obligations — counsel was always effective at cross-examination. Indeed, counsel conceded his understanding of the heart of the fraudulent scheme when in his opening statement he said "I do not think I oversimplify when I suggest that the only issue, the only part of this whole mish-mash we have been hearing, that is actually relied on, is the claim of the Government that customers were misled somehow or other into signing conditional sales papers * * *." And as to the specific misrepresentation which apparently proved so fatal to appellants' case, counsel as effectively as we think possible argued his clients' position: that the words "to see" in New England's sales statement "Now let's say you send us to see 50 people * * * at least 50% will Qualify", limited the representation to one suggesting the enrollment of 50 per cent of referrals who permitted demonstrations rather than of 50 per cent of referrals whether these led to demonstrations or not.
 
 
 21
 Viewing the record as a whole, we can only conclude that the process complained of appears to have been little more than a whittling down of the prosecution's weapons. Of the twenty substantive paragraphs in Count I, incorporated in all other counts by reference, eleven were struck in whole and five in part. Only four remained intact. And, as a consequence of this, of the several theories of fraud alleged by the Grand Jury only one reached the trial jury. We think appellants' right to be informed of the nature of the charge against them was adequately protected.
 
 II. JURY SELECTION
 
 22
 Appellants make three arguments to support their contention that the court committed reversible error in impaneling the jury. Two are unsupported by law or fact, but the third merits detailed consideration.
 
 
 23
 The first contention is that the court disqualified prospective jurors simply because they were acquainted with counsel in the case. Cf. United States v. Carpintero, 398 F.2d 488 (1st Cir.1968). Even were disqualification by the court on these grounds reversible error, the record gives no substantial support to the statements contained in the briefs. Appellants list twelve names and say as to these that there was "no showing of attorney-client relationship, or bias, or reason for excuse. * * *" The record is the following: two of these prospective jurors were not excused for cause, although one was later peremptorily challenged by the government; a third was a "family friend" of one of the counsel; a fourth saw one of the attorneys frequently; a fifth was a political associate during campaigns; three more had been represented by one of the attorneys; a ninth knew one of the attorneys so well that the latter's overt reaction and laughter in the courtroom indicated the proper ruling. The tenth, it is true was excused upon the juror's volunteering before being asked that he knew one of the trial counsel. To allege reversible error, on this state of the record, particularly when the court had refused on at least six occasions to excuse a prospective juror because of mere acquaintance with one of the attorneys, is to do no service to appellants' more meritorious points.[3]
 
 
 24
 This brings us to the most serious issue raised by this appeal: whether the court, in allowing both counsel for appellants and the government unlimited peremptory challenges, committed reversible error.[4]
 
 
 25
 A summary of the impaneling record seems to us a prerequisite to considering this issue. Our overall impression is that the multiplicity of issues which arose during this stage of the proceedings stemmed from a lack of effective communication. Court and counsel, all seasoned in the trial of cases, spoke against the background of quite separate experience. The district judge, sitting by special assignment, was not acquainted with local custom, and counsel were equally unfamiliar with the routines which the court was attempting to follow. The result at times was as if conversation was carried on in two languages.
 
 
 26
 The pre-trial order recited simply that "The Government shall have with respect to the 12 jurors to try the case 6 peremptory challenges, defendant Interstate will have 6, and the other defendants as a group will have 6." As will be seen, the court and counsel had widely differing interpretations of this language.
 
 
 27
 The sequence of issues arising subsequent to the court's interrogation and tentative seating of twelve jurors may be summarized as follows:
 
 
 28
 1. Colloquy on rotation. The government announced its satisfaction with the twelve seated in the box and counsel for appellants and for Interstate were invited to proceed. Counsel for appellants, whose experience it had been to approach the clerk's bench with other counsel and there to challenge in rotation, with any failure by a party to challenge on any round constituting a waiver, suggested that this practice be followed. The court, noting that the government had no objection to the twelve already seated, repeated its invitation that one of the defending counsel proceed.
 
 
 29
 2. Objection to open challenges. At this point counsel for appellants objected to being required to challenge in front of the jury. The court stated that it would not require statements in front of the jury, adding "You may proceed to the Clerk's desk, if you prefer that, or you may say in open Court which ones you challenge." Counsel for Interstate then objected to the procedure "as being totally foreign" to local custom — apparently construing the court's permission to go the clerk's desk as affording no more anonymity than a vocal challenge by counsel. The court stated that it was following the practice approved in this circuit and by the Supreme Court.
 
 
 30
 3. Objection to sequence. Counsel for appellants, apparently realizing that although the government was content with the twelve tentatively seated jurors it had not waived its right to challenge others, asked if the government was to be allowed later challenges. The court replied that the government "has retained its right to challenge with respect to anybody hereafter seated." Counsel said: "I object to that procedure, your Honor. As I understand it, the appropriate procedure is that the government exercises its challenges first and we then challenge in rotation until all challenges are exhausted."
 
 
 31
 4. Objection to immediate disclosure of challenge. Counsel for Interstate then proceeded to challenge. We infer from the record that he had gone to the clerk's desk, notified the clerk of one or more of his challenges, and that the clerk was planning to call replacements without immediately asking the challenged jurors to step down. In any event, when the clerk called the first replacement, the court required that the juror challenged should be immediately identified. Counsel for appellants objected, saying that he had followed a different practice for 25 years.
 
 
 32
 5. Bench conference on waivers. After counsel for Interstate exercised three more challenges, the government accepting each replacement, a bench conference was held to discuss the last replacement. In the course of the conference, counsel for appellants, apparently still confused, inquired of the court whether each time counsel for Interstate challenged the government had not also waived a challenge by its inaction. Counsel asked if the effect of the procedure would give the government twelve or eighteen challenges.
 
 
 33
 At this point the court and counsel were still far apart in communications, as is illustrated by the court's explanation that "The government will have challenges only with respect to people hereafter seated in the box" and counsel's response "[This] gives [the government] a chance to consider 12 times, six on [Interstate] and six on mine." That this was not what the court meant was later made more clear. But at this juncture the understanding gap was not bridged. The court merely said that counsel's point was clear (the only point that was clear was that counsel had not understood what the court had said) and that this was "the usual practice in the Circuit." And counsel stated that this was contrary to the pre-trial agreement.
 
 
 34
 6. Final clarification. In resuming before the jury, counsel for Interstate was still unclear as to his rights if he waived further challenges at this point. The court said that he would be waiving only as to the persons then in the box and for the first time spelled out the subsequent procedure in the following colloquy:
 
 
 35
 "The Court: You will have a challenge with respect to any person seated hereafter. I want to make it quite clear that the number of six peremptory challenges is limited to the first 12 in the box and that thereafter — not the first 12 in the box, no, the first opportunity you have to challenge, that is, the 12 who are in the box at the moment you begin to challenge anybody seated hereafter you have a right to challenge.
 
 
 36
 "Mr. Phinney [Interstate]: To the extent I have peremptory challenges. "The Court: Without any limit. That is so with respect to anybody seated hereafter. * * *"
 
 
 37
 * * * * * *
 
 
 38
 "Mr. Wall: [government]. Without limit? Doesn't that place no limit on peremptory challenges?
 
 
 39
 "The Court: I think it will not operate that way in fact."
 
 
 40
 7. Subsequent impaneling. Counsel for Interstate proceeded to exercise his fifth and sixth challenges and counsel for appellants began. After his third challenge — to juror number three — replacements for that seat were called. The government challenged the first six. Interstate used its seventh challenge on the seventh and the government its seventh challenge on the eighth. At this point the court said to counsel for appellants, "You will find that you have as many challenges as anybody else, or more, Mr. Brown, in your anchor position." Counsel replied, "I'm beginning to appreciate that now, your Honor."
 
 
 41
 The impaneling continued without further incident. Thirty-nine peremptory challenges were exercised, twelve by the government, twenty-one by Interstate, and six by counsel for appellants.
 
 
 42
 Coming first to the question whether it was error for the court to have proceeded in this manner, we observe preliminarily that the court's effort was obviously to give maximum opportunity to the parties to reject jurors whom they did not want. The defendants exercised this opportunity on more than twice the number of jurors challenged by the government. If a peremptory challenge is a valued right, why is not a limitless right even better?
 
 
 43
 The answer is that it is better if the power to reject hostile jurors is the sole criterion, but Rule 24(b) puts a numerical limit on the extent that this benefit may be enjoyed. We read the rule's final sentence allowing the court to grant additional peremptory challenges in cases of multiple defendants as impliedly negativing any other authority to exceed the numbers prescribed by the rule. This reading finds support in the detailed deliberations which led to the final wording of the rule, which was the product of extensive discussion and no fewer than nine drafts over a period of three years. The government's challenges in capital cases were increased from six to twenty. The provision for challenges in non-capital felony cases went through four different versions. A suggestion that the court should be allowed to increase the challenges of the government in multiple defendant cases was not acted upon. Orfield, Trial Jurors in Federal Criminal Cases, 29 F.R. D. 43, 43-47, 53 (1962).[5]
 
 
 44
 Perhaps the court below deemed that it was acting pursuant to Rule 24(b) in applying its numerical limits only to those jurors seated in the box when a party commenced challenging. If so, we have been able to find no authority supporting this construction. It seems clear to us that the theoretical infinity and likely expansion of challenges far beyond the ceilings set by the rule which such an interpretation makes possible argue sufficiently against it.
 
 
 45
 We see reason for limiting peremptory challenges. The much quoted language of Justice Story in United States v. Marchant, 25 U.S. (12 Wheat.) 480, 481, 6 L.Ed. 700 (1827) that "The right of peremptory challenge is not, of itself, a right to select, but a right to reject jurors", might indicate that an expansion in the rights of both sides in a criminal case to reject jurors could not possibly be prejudicial. But while it is true that a defendant has no right to have particular individuals on a jury or a particular segment of the community represented, the giving of unlimited challenges on both sides opens up the prospect of a jury so trimmed according to the intuitions of counsel that it would no longer have any claim to being even a rough cross section.
 
 
 46
 In this case, for example, fifteen women were called (including two alternates) and only two were seated as members of the regular panel, with two being chosen as alternates. The defendants made all eleven challenges. Eight of the government's twelve challenges were to persons who were or had been in business. While the jury finally seated in this case seems to have been fairly representative, despite these apparent tactics by the prosecution and the defense,[6] we can imagine distortions in composition which would go far to deprive juries of the qualities of diversity and representativeness which traditionally have been considered the wellsprings of sound judgment.[7] While the giving of an excess peremptory in situations where court and counsel are oblivious to the fact would perhaps seldom be prejudicial and easily waived, see Kloss v. United States, 77 F.2d 462, 463 (8th Cir.1935), the prospects of a policy of open-ended peremptories are ominous. Since it would rarely be possible for a defendant to prove prejudice, proper objection to unlimited challenges should be grounds for reversal. If these were not so, there would be no sanction insuring adherence to the rule by trial courts. However, the question remains whether proper objection was taken and, if so, whether such objection was subsequently waived.
 
 
 47
 As our account of the impaneling indicates, this is not a simple example of a trial judge making a ruling to which counsel registered his objection. In one sense counsel for appellants was continually protesting the entire procedure, which was alien to him. But in the context of these tortuous proceedings we are not persuaded that as to the precise point urged on appeal — the granting of unlimited peremptory challenges as to all prospective jurors called after the first twelve — objection was taken or intended to be taken.
 
 
 48
 Initially there was the suggestion by counsel that the local practice of rotating challenges be followed. There was no objection at this point. Then there was Interstate's objection to the court's open challenge requirement. This was followed by counsel for appellants objecting to the government's having challenges subsequent to those of the defense. When counsel for Interstate began his challenges, counsel for appellants objected to the immediate unseating of a juror upon being challenged. Then at a bench conference counsel for appellants, deeming that the government waived a challenge every time it remained silent, was of the opinion that this procedure would give the government twelve challenges, notwithstanding the pretrial order allotment of six.
 
 
 49
 Up to this time it is clear from the questions of all counsel that the ultimate procedure which the court had in mind was not understood. Only in the colloquy which we have quoted did the court spell out the fact that the pretrial limits on peremptory challenges referred solely to the twelve jurors seated in the box when a party commenced challenging and that challenges to subsequent jurors were without limit. From this point on there was neither protest nor objection. When counsel for Interstate exercised his seventh challenge, counsel for appellants remainded silent. Immediately thereafter, when the government exercised its seventh challenge, the court took occasion to comment that counsel for appellants, being in "anchor position", would have as many challenges as anybody else. At this point, if not earlier, appellant ought to have registered a protest if he had felt prejudiced by the prospect of the government having more than six challenges. Instead, he said "I'm beginning to appreciate that now, your Honor."
 
 
 50
 We do not think we are indulging in over-technical niceties when we conclude from this record that no objection to this aspect of the procedure was either intended or made. If it was intended, we do not think the intent was made manifest to the court. This was not a situation where counsel was either inexperienced or cowed into submission by the court. There had been a running series of protests, misunderstandings, and three formal objections on other points. To say that on the one issue which, when finally understood, elicited a favorable response we should find that error was sufficiently pointed out and protested would be oversolicitous.
 
 III. ALLEGED ERRORS DURING TRIAL
 
 51
 Appellants also allege judicial overzealousness and cite eight categories of error in support. We have closely scrutinized each reference and have studied the record as a whole. Our examination indicates that defense counsel fared at least as well as the U.S. Attorney. Some of the appellants' citations to the transcript reflect what seems to us to be a misunderstanding of the court's action, as, for example, its brief examination of a witness to determine facts necessary to a ruling on an objection. Others can be the basis for criticism only if we reject the long-standing tradition that a federal judge is more than a passive referee and has a positive responsibility for the management of a trial, including clarifying the issues as he sees them.
 
 
 52
 More serious are the allegations that the intonations and emphasis contained in the charge were prejudicial and would have been so manifest had we allowed the tape recording to be preserved. Our careful reading of the lengthy charge assures us that it is unlikely that such intonations as an attentive advocate may have detected could have bulked large in the course of a three hour discussion of the issues dealing almost wholly with legal theory. As to other allegations of misconduct we can only say, as we did in Killilea v. United States, 287 F.2d 212, 216 (1st Cir.), cert. denied, 366 U.S. 969, 81 S.Ct. 1933, 6 L.Ed.2d 1259 (1961), that to detect bias requires the sensitivity of the princess and the pea. This was a long trial involving complex issues and frequent and vigorous exchanges between seasoned counsel and the court, some of them exhibiting considerable bluntness on the part of appellants' attorney. On the whole we are persuaded that this trial was fairly conducted, and that the court's intervention was evenhandedly directed at both sides and did not exceed its discretion.
 
 
 53
 Another asserted error is the admission against Interstate of a copy of a consent order of the Federal Trade Commission. The order, dated June 21, 1963, compelled Interstate to cease and desist from making certain representations, in part similar and in part identical to those charged against all appellants here, in connection with the promotional sales scheme used by Interstate in marketing its Compact cleaners. It was introduced to show that from the file date forward Interstate had notice and knowledge of the Commission's considered judgment that their promotional scheme was deceptive. This fact, of course, was relevant to Interstate's intent as it related to conduct which became the subject of prosecution. We think the order properly admitted.
 
 
 54
 The court carefully instructed the jury at the time it allowed the exhibit in evidence and again when it delivered its charge that the order could be considered by them only on the question of intent. It is a generally accepted principle of law that prior similar acts are admissible to prove intent. E.g., Allen v. United States, 289 F.2d 235 (5th Cir.1961); Goodman v. United States, 273 F.2d 853, 857 (8th Cir.1960); 2 Wigmore, Evidence §§ 302, 341 (3d ed. 1940). Although the subject matter before the F.T.C. did not involve mail fraud it nevertheless did involve the same kind of underlying sales representations asserted to be fraudulent at trial below.
 
 
 55
 Recognizing the government's legitimate interest in probing the effect the F.T.C. order may have had on intent, we see the court as having at the same time endeavored to shield appellants from its prejudicial misuse. The court made perfectly clear that the order was a consent order, that Interstate's acquiescence did not constitute an admission or concession, that the Federal Trade Commission was not a criminal jury and its judgment not controlling, and, finally, that the order was probative of appellants' intent only if the jury first found that a scheme to defraud existed and further found that appellants had notice of the consent decree (a fact their counsel stipulated to during trial). As we have said in another connection,
 
 
 56
 "Considerate as courts have been and wish to be of defendants' rights, their protection cannot be expected to achieve absolute limits. It must be sufficient in an instance such as this that the jury is instructed to restrict evidence to its proper sphere, and not to convict unless, on the merits, it has no reasonable doubt." Stack v. United States, 368 F.2d 788, 790 (1st Cir. 1966).
 
 
 57
 Lastly, appellants allege error in the court's charge as given and in the court's refusal to charge in accordance with certain requested instructions. Treating the latter first, we direct our attention to a two-page requested charge based upon appellants' defense that none of them devised or intended to devise any fraudulent scheme. This was one of twenty-five requests comprising some thirty-five pages. While most of Request No. 20 consisted of statements of law substantially given by the court in its main charge and a recitation of appellants' account of the facts as they related to the selling scheme — clearly within the court's discretion to have refused — one of six paragraphs twice mentioned the words "good faith". Appellants allege failure to give the substance of this portion of the request as error. We think the court did give the substance of this request, though not in the precise words counsel sought.
 
 
 58
 It is settled law that good faith is a complete defense to a charge of mail fraud. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L. Ed. 709 (1896). Notwithstanding the assertion of the government to the contrary, we find enough evidence of good faith here to justify reliance on that defense by appellants. This, however, is not to say that the failure of the court to have given a haec verba instruction is reversible error. There is nothing so important about the words "good faith" that their underlying meaning cannot otherwise be conveyed.[8]
 
 
 59
 What is important, and determinative of appellants' appeal on this issue, is whether the record evidences a substantive presentation of the defense of good faith to the jury. We think that it does. Appellants' counsel, as he himself points out, emphasized good faith in his opening presentation when he stated that it was his clients' position that they engaged in their work "as an honest, lawful business activity. * * *" Further on he also said that "Our evidence will be that * * * there was no intention on the part of any of these men to defraud anyone, and no knowledge on their part that any legitimate claim could be made that the program they were using was fraudulent, that they worked hard at their calling for no other purpose than the ordinary purpose of trying to get ahead in the world and maintain their families." And he was even more to the point in his closing argument:
 
 
 60
 "Basically, when you get all done listening to everybody, your basic problem is going to be, `Were these men operating in good faith or not?' That is where you are going to end up, regardless of all the verbiage."
 
 
 61
 We think it perfectly clear that the issue of good faith was directly before the jury.
 
 
 62
 The court referred to this part of counsel's argument by saying "Now we come to what Mr. Brown has said is the most important issue — intention." It proceeded to distinguish the offense charged from crimes not requiring intent and stated that to be convicted of its commission, one "must have the intent, the specific intent to do wrong. He must be acting knowingly to defraud and meaning to participate in it." On a number of other occasions the court referred in different ways to this requirement, as a specific intent "to commit a fraud", "to deceive", to "knowingly, wilfully, intentionally * * * do a wicked act". All of this is necessarily inconsistent with good faith and forced the jury to consider good faith and honest belief before making a determination. Viewing the record as a whole and the charge as given, we find no error. The addition of other synonyms was not required. Beck v. United States, 305 F. 2d 595, 599-600 (10th Cir.), cert denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123 (1962).[9]
 
 
 63
 Appellants also assert error in a portion of the court's charge which stated that the government need not, in order to show the existence of a fraudulent scheme, prove that someone has in fact been defrauded. This, argue appellants, is both an incorrect statement of the law and contradictory to the language of the indictment. We disagree. The indictment did not allege that anyone was in fact defrauded as a result of appellants' scheme. It simply charged appellants with devising and intending to devise a scheme to defraud and the use of the mails for the purpose of executing that scheme. This is all the law requires, as the Supreme Court and at least eight circuits have recognized. Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Rowe, 56 F.2d 747, 749 (2d Cir.), cert. denied, 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932); Cohen v. United States, 50 F.2d 819, 820 (3d Cir.1951); Adjmi v. United States, 346 F.2d 654, 657 (5th Cir.), cert. denied, 382 U.S. 823, 86 S.Ct. 54, 15 L.Ed. 2d 69 (1965); Henderson v. United States, 202 F.2d 400 (6th Cir.1953), cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253 (1955); United States v. Meyer, 359 F.2d 837, 839-840 (7th Cir.), cert. denied, 385 U.S. 837, 87 S.Ct. 85, 17 L.Ed.2d 71 (1966); Pritchard v. United States, 386 F.2d 760, 764 (8th Cir.1967); Gusow v. United States, 347 F.2d 755, 756 (10th Cir.), cert. denied, 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965); Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, 743, cert. denied, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659 (1946).[10]
 
 
 64
 There is one other contention which appellants make. They have construed part of the court's instruction, analogizing a jury to a parliament in the sense that within the framework of statutory and common law standards a jury must determine whether conduct is fraudulent or not, as improperly allowing the jury to determine a question of law. We do not derive such a meaning. The analogy was properly qualified and was given in the context of an elaborate discussion of relevant legal standards.
 
 
 65
 To be sure, in a society known for aggressiveness in merchandising, the concept that some techniques under the rubric of salesmanship may invoke criminal sanctions may still be unfamiliar to some. But the principle and the law are not new. Appellants were ably represented. The trial was fair. The verdict must stand.
 
 
 66
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The endless chain theory involves a consideration of the relationship between the number of prospective buyer referrals which must be available to satisfy customer demand and the number of such referrals actually available. As a theory of fraud it presupposes that because each new purchaser of a Compact cleaner must, in order to earn bonuses and thus reduce his own cost, identify at least ten others who become purchasers, and each of them in turn ten more, the "rate of progression would soon exhaust the potential" in an area like that served by New England. Compare Fabian v. United States, 358 F.2d 187 (8th Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L. Ed.2d 58 (1966)
 
 
 [2]
 It is true that the court told counsel on the thirteenth day, at a bench conference, that the fraudulent scheme upon which the case was based involved a failure to disclose certain facts, namely, the frequency of contact, appointments and enrollment of prospects. The court relied on ¶ 19 of the indictment. But ¶ 19, while charging an omission to state material facts, was limited to an omission to state the theoretical impossibility of an endless and exponentially expanding market. Hence it did not relate to the specific omissions cited by the court — as the court realized and conveyed to counsel on the fifteenth day
 While there may have been some confusion as to the substitution of "omission" for "misrepresentation" in that interim period, we can see no prejudice. These words have only a technical relevance in that their use and applicability is governed by the language of the indictment. They do not affect the nature of the scheme itself. Indeed, the fraudulent scheme did involve the frequency of contact, appointments and enrollments and to the extent that representations as to enrollments departed from actual experience statistics they were misrepresentations. This was a situation where a misrepresentation as to a probability and concealment as to actuality were two sides of the same coin.
 
 
 [3]
 We pass, as not deserving any discussion, appellants' second contention, without analysis or supporting citation, that requiring peremptory challenges to be openly exercised was prejudicial error. That the district court's method is not unusual is well recognized. See, e.g., The Jury System in the Federal Courts, 26 F.R.D. 409, 468 (1960)
 
 
 [4]
 Fed.R.Crim.P. 24(b) states:
 "(b) PEREMPTORY CHALLENGES. If the offense charged is punishable by death, each side is entitled to 20 peremptory challenges. If the offense charged is punishable by imprisonment for more than one year, the government is entitled to 6 peremptory challenges and the defendant or defendants jointly to 10 peremptory challenges. If the offense charged is punishable by imprisonment for not more than one year or by fine or both, each side is entitled to 3 peremptory challenges. If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly."
 
 
 [5]
 Our research reveals a complete absence of cases dealing with the discretion of a federal district court under Rule 24(b) to allow expanded challenges as was done below. Counsel on both sides have been able to cite only 95 A.L.R.2d 957, which, except for Kloss v. United States, 77 F. 2d 462 (8th Cir. 1935), noted infra, collects state authorities on the general question of excess peremptories. They are of little relevance to our problem of applying Rule 24(b)
 
 
 [6]
 In the absence of evidence that the jury as finally selected was other than representative and impartial, we do not consider the error here to be plain error under Fed.R.Crim.P. 52(b). See Shotwell Mfg. Co. v. United States, 371 U.S. 341, 363, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963)
 
 
 [7]
 The possibilities would be obvious in a community of high density of black population if the prosecution were allowed to exercise unlimited peremptories. See Swain v. State of Alabama, 380 U.S. 202, 226-227, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)
 
 
 [8]
 Indeed, appellants apparently recognize this fact for while they state in their reply brief that "[i]n opening [they] advised the Court and jury that their defense would bewholly their good faith", a reading of counsel's opening statement discloses that those specific words were never used.
 
 
 [9]
 We recognize the existence of authority which is arguably to the contrary. See Steiger v. United States, 373 F.2d 133 (10th Cir. 1967); Coleman v. United States, 167 F.2d 837 (5th Cir. 1948). While we think these cases distinguishable on their facts, to the extent they may require more than we hold here, we decline to follow them
 
 
 [10]
 Cases cited by appellants to the contrary are distinguishable. United States v. Rabinowitz, 327 F.2d 62 (6th Cir. 1964), and United States v. Baren, 305 F.2d 527 (2d Cir. 1962), both require proof of actual deception, the former relying on the latter as authority. Each involved a fraudulent scheme where knitting machines were sold on the basis of their ease of workability and potential for profits from the sale of knitted products to the seller. Like our case, the quality of the machine and its ability to perform its functions were not before the jury. Unlike our case, the ease of workability, and hence the likelihood of profitable use, was. While both opinions flatly state that in every mail fraud case some person must have been defrauded, the Second Circuit in the later case of United States v. Andreadis, 366 F.2d 423 (2d Cir. 1966), cert. denied, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967), reaffirmed its adherence to the general rule which does not require such proof, and, limitingBaren to its facts, stated that a broader interpretation given Baren by other courts, see, e.g., United States v. Brunet, 227 F.Supp. 766 (W.D. Wis.1964), was not determinative. We need not now decide whether Baren, even as explained by Andreadis, is a correct statement of the law.